# RICH *v.* BRAXTON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WEST VIRGINIA.

No. 17. Argued November 16, 17, 1893. — Decided May 6, 1895.

C., in his lifetime, was in possession, claiming ownership under divers patents of the Commonwealth of Virginia, of several contiguous tracts of land in West Virginia, described in the several surveys thereof. In September, 1875, they were sold for non-payment of taxes assessed upon them for the year 1874, and, under the operation of the tax laws of that State, the title was suspended for one year, the State being the purchaser, in order to enable the owner to pay the taxes within that year, and thus free the land from the charge. C. died three months before the expiration of the year. After his death and after the expiration of the year, his heirs commenced proceedings under the state statutes, praying for leave to pay all back taxes and to acquire the title to the lands which had then become vested in the State. Decrees were entered giving them permission to redeem, and releasing the lands from the forfeiture and from all former taxes and damages. Under these decrees they made the payments. They then found that an adverse title to the lands was set up by purchasers at tax sales made in 1869 for the non-payment of taxes assessed in 1868, to persons claiming under other alleged surveys, and under other grants from the Commonwealth, and under other tax sales made prior to the separation, which are set forth in detail in the opinion of the court. The heirs of C. thereupon filed their bill in equity against the persons setting up such adverse title, praying for a decree annulling the deeds under which the defendants claimed title, and the removal thereby of the cloud created by them on the plaintiff's title. *Held,*

(1) That the claims of the heirs of C. were sustained, unless overthrown by the evidence adduced by the defendants ;

(2) That the examination and review of that evidence by the court showed that the tax sale of 1869 had no validity, and that there was nothing in the case to affect the validity of the claim of the heirs of C.

By the law of Virginia in force prior to the creation of the State of West Virginia, it was the duty of the sheriff or collector, when lands were sold for taxes, to purchase them on behalf of the Commonwealth for the amount of the taxes, unless some person bid that amount ; and any lands so purchased and certified to the first auditor vested in the Commonwealth without any deed for that purpose, and could have been redeemed in the mode prescribed by the statute.

Whatever title Virginia had to lands so purchased and not redeemed, and

which were within the territory now constituting West Virginia, passed to the latter State upon its admission to the Union.

The time given by the constitution and laws of West Virginia to redeem lands that had become the property of Virginia by forfeiture or by purchase at sheriff's sale for delinquent taxes, and which had not been released or exonerated in conformity to law, expired June 20, 1868.

By section 3 of Article XIII of the constitution of West Virginia, the title to lands of the character described which were not redeemed, released, or otherwise disposed of, and which was vested in and remained in the State, was transferred to and vested — (1) In any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much thereof as such person shall have had actual, continuous possession of under color or claim of title for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such possession; or (2) if there were no such person, then to any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much of said land as such person shall have title to, regularly derived, mediately or immediately, from or under a grant from the Commonwealth of Virginia, which, but for the title forfeited, would be valid, and who, or those under whom he claims, has or shall have paid all state taxes charged or chargeable thereon for five successive years after the year 1865, or from the date of the grant, if it was issued after that year; or (3) if there were no such person as aforesaid, then to any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much of said land as such person shall have had claim to and actual, continuous possession of, under color of title, for any five successive years after the year 1865, and have paid all state taxes charged or chargeable thereon for said period; and the defendants' case belongs to neither class.

The proceedings instituted by the commissioner of the school fund, under the act of November 18, 1873, for the sale of escheated, forfeited, and unappropriated lands were, in a judicial sense, *ex parte;* neither *in rem* nor *in personam.*

The words in the 13th section of that act — " at any time before the sale of any such land . . . such former owner or any creditor of such former owner of such land, having a lien thereon, may pay . . . all costs, taxes, and interest due . . . and have an order made in the order book . . . which order, so made, shall operate as a release on all former taxes on said land, and no sale thereof shall be made, embrace those — (in this case the heirs of C.) — who in law would have owned the lands, if they had not been sold for taxes, or, if sold, had been redeemed within the prescribed time after the sale at which the State purchased.

In West Virginia it is the settled rule that a court of equity has jurisdiction to set aside an illegal or void tax deed.

According to settled rules, equity will not interfere to remove an alleged

cloud upon title to land, if the instrument or proceeding constituting such alleged cloud is absolutely void upon its face, so that no extrinsic evidence is necessary to show its invalidity; nor will it interfere if the instrument or proceeding is not thus void on its face, but the party claiming, in order to enforce it, must necessarily offer evidence which will inevitably show its invalidity and destroy its efficacy.

But equity will interfere where deeds, certificates, and other instruments given on sales for taxes, are made by statute *prima facie* evidence of the regularity of proceedings connected with the assessments and sales.

THE case is stated in the opinion.

*Mr. John F. Keator* and *Mr. John A. Hutchinson* for appellants.

*Mr. S. Morris Waln* filed a brief for appellants.

*Mr. James H. Ferguson* for appellees.

*Mr. W. Mollonan* filed a brief for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

The appellees, who were the plaintiffs below, are the children and heirs at law of Allen T. Caperton, who, the bill alleged, was seized and possessed at the time of his death of an estate in fee in various tracts of land in West Virginia which are fully described in the pleadings.

The appellants, who were defendants below, assert ownership of the same lands.

The object of the present suit — which was removed from one of the courts of West Virginia — was to obtain a decree annulling the deeds under which the defendants claim title, and thereby remove the cloud created by them on the title of the plaintiffs. By the final decree those deeds were set aside as inoperative, fraudulent, and void, and as clouds upon the plaintiffs' title, "so far as they and each of them overlap and include any of the lands of the said plaintiffs as laid down and shown upon the map filed with the papers of this cause, marked 'Map of the lands in the suit of Caperton's Heirs *v.* Rich and others, Decree Map.'"

Attention will first be directed to the title asserted by the plaintiffs. They derive title from numerous patents and deeds, as follows :

1. A patent from the Commonwealth of Virginia, dated March 25th, 1795, to Robert Morris for 153,900 acres of land in the county of Greenbrier; a deed from Robert Morris and wife, dated March 13th, 1797, conveying to William Crammond several tracts, including the above tract of 153,900 acres; a deed from William Crammond and wife, dated October 28th, 1814, to Thomas Astley, covering all the above lands conveyed by Morris and wife to William Crammond; a deed dated December 10th, 1840, to Henry Crammond from Littleton Kirkpatrick and wife, (the latter being the only heir at law of Thomas Astley,) and Sarah Astley, the widow of Thomas Astley, embracing the lands covered by the deeds from Morris and wife and William Crammond; a deed by Henry Crammond to John Williams, dated December 21st, 1842, conveying to the latter the tract of 153,900 acres.

2. A deed to Caperton by John Williams and wife, dated February 21st, 1850, conveying to the grantee 77,104 acres of the tract of 153,900 acres named in the Morris patent. Caperton sold and conveyed a part of the land embraced by this deed, so that, at his death, he claimed to own only 41,171½ acres of the above 77,104 acres.

3. A patent from the Commonwealth of Virginia to Abner Cloud, assignee of Lewis Franklin, dated March 10th, 1790, for 5000 acres in Harrison County, on the waters of Gauley River. By a change in the lines of counties this tract was included in the county of Nicholas. It appears from the official records that these 5000 acres were forfeited to that Commonwealth in 1842 for the failure of the owner to enter them upon the books of the commissioner, and for non-payment of taxes. That fact being regularly reported by the commissioners of delinquent and forfeited lands to the Nicholas County circuit superior court, they were ordered by that court to be sold in the manner and upon the terms prescribed by law; and they were sold, John Williams becoming the purchaser. The sale having been confirmed, a deed was made to Williams June 20th, 1843, by the

commissioner of delinquent and forfeited lands for Nicholas County. Subsequently, February 21st, 1850, Williams and wife conveyed to Caperton the above 5000 acres as well as various other tracts that had been sold under the order of court by that officer and purchased by Williams.

4. A patent from the Commonwealth of Virginia to A. C. and D. B. Layne, dated September 1st, 1851, for 2738 acres in what is now Webster County, West Virginia. A. C. Layne and wife, by deed of March 18th, 1856, conveyed their interest to Douglas B. Layne, who, with his wife, by deed of April 12th, 1859, conveyed to Caperton.

5. Patents from the Commonwealth of Virginia to Austin Hollister, one dated November 1st, 1855, for 9330 acres, and the other dated February 1st, 1858, for 5938 acres, both tracts being in Randolph County. By deed of February 12th, 1859, Hollister and wife conveyed both of these tracts to Caperton.

It appears that in 1881 the children and heirs at law of Caperton — he having died in July, 1876 — presented to the circuit court of Webster County, West Virginia, a petition asking that they be allowed to redeem from forfeiture and sale the above tracts of 9330, 5938, 5000, and 2738 acres, as well as a tract of 500 acres, all assessed in the name of Caperton. The petition stated that there were no persons in condition to take the benefit of the forfeiture of those lands or any part of them under the provisions of section three of article thirteen of the constitution of the State, and that they were entitled to redeem the same in the manner provided by the thirteenth section of the act of the legislature of West Virginia, (Acts W. Va. 1872-3, p. 455, c. 134,) providing for the sale of escheated, forfeited, and unappropriated lands for the benefit of the school fund.

The section of Article XIII of the constitution of West Virginia to which reference was made in that petition is in these words:

"3. All title to lands in this State heretofore forfeited, or treated as forfeited, waste, and unappropriated, or escheated to the State of Virginia, or this State, or purchased by either of said States at sales made for the non-payment of taxes and become irredeemable, or hereafter forfeited, or treated as for-

feited, or escheated to this State, or purchased by it and become irredeemable, not redeemed, released, or otherwise disposed of, vested and remaining in this State, shall be, and is hereby transferred to, and vested in any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much thereof as such person has, or shall have had actual continuous possession of, under color or claim of title for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such possession; or if there be no such person, then to any person (other than those for whose default the same may have been forfeited, or returned delinquent, their heirs or devisees) for so much of said land as such person shall have title or claim to, regularly derived, mediately or immediately from, or under a grant from the Commonwealth of Virginia, or this State, not forfeited, which but for the title forfeited would be valid, and who, or those under whom he claims, has or shall have paid all state taxes charged or chargeable thereon for five successive years, after the year 1865, or from the date of the grant, if it shall have issued since that year; or if there be no such person, as aforesaid, then to any person (other than those for whose default the same may have been forfeited, or returned delinquent, their heirs or devisees) for so much of said land as such person shall have had claim to and actual continuous possession of, under color of title for any five successive years after the year 1865, and have paid all state taxes charged or chargeable thereon for said period."

The statute referred to was that of November 18, 1873, entitled "An act to provide for the sale of escheated, forfeited, and unappropriated lands for the benefit of the school fund."

By that statute the former owner of lands, the title to which was in the State by forfeiture or purchase, and which were ordered to be sold by the proper circuit court for the benefit of the school fund, was allowed, upon proof of title superior to that asserted by any other claimant, to receive the excess over the taxes charged and chargeable thereon,

with interest at twelve per cent — such exhibition and proof of title being made within two years after sale under the order of court. The former owner, or any creditor of such owner having a lien on the land, was also permitted, at any time before sale, to pay into court, with its consent, all costs, taxes, and interest due the State, and obtain an order releasing all former taxes on the land and suspending the sale thereof — such payment, however, not to affect or impair the title to any portion of such lands transferred to and vested in any person in virtue of section three of Article XIII of the state constitution. Acts of W. Va. 1872–3, pp. 449, 454, 455, c. 134.

The commissioner of school lands, whose duty it was to ascertain the quantity of land in his county subject to sale under the above statute, (§§ 1, 2,) reported to the proper circuit court that the taxes and interest charged and chargeable against the tracts of 9330, 5938, 5000, and 2738 acres claimed by the heirs at law of Caperton, amounted to $1785.82; and against the tract of 500 acres, the sum of $18.69. The prayer of the petition was granted. The final order of the court contained these provisions: "The petitioners having exhibited to the court their title papers, showing that they have title to each of the five several tracts of land mentioned in their petition and amended petition aforesaid, regularly derived from the Commonwealth of Virginia, and the court, being of opinion that the petitioners have a good and valid title to said lands, and it not appearing that there is any person in condition to take the benefit of the forfeiture thereof, doth consent and order that petitioners may redeem said lands from forfeiture. And thereupon petitioners, with the consent of the court, paid into court, to the hands of the said Duffy, commissioner of school lands, $1804.51, being the amount of taxes and interest due on said lands at this date, and $4.50 costs of this proceeding. It is therefore adjudged, ordered, and decreed that said several tracts of 2738, 5000, 9330, 5938, and 500 acres of land have been redeemed, and that they be and *stand released from said forfeiture and exonerated and released from all other former taxes and damages*, if any such there be,

and no sale thereof shall be made on account thereof, and said several tracts of land are *hereby reinstated* and directed to be entered and charged on the land books of said county of Webster, commencing with the year 1881, *in the names of the heirs at law of said Allen T. Caperton, deceased.*"

In the circuit court of Nicholas County there were similar proceedings in 1881 for the redemption from forfeiture and sale for non-payment of taxes of the tract of 41,171¼ acres and other tracts standing in the name of Caperton. The back taxes, with interest, charged and chargeable upon those lands, were adjudged to be $3100.87. That amount was paid by the heirs of Caperton, and it was adjudged that these tracts " be and are released from such forfeiture and exonerated and released from all other former taxes and damages, if any such there be, and no sale thereof shall be made on account thereof, and the said several tracts of land are each hereby reinstated in all respects as if no such forfeiture had occurred, and the assessor of Nicholas County is ordered and directed to enter said lands in separate tracts on the land books for said county for the year 1881 *in the name of Allen T. Caperton's estate* and charge the same with taxes commencing with the year 1881, *all prior taxes, including the year* 1880, *having been paid as aforesaid.*"

The court below, in the present case, after observing that Caperton's title was regularly deducible from the Commonwealth of Virginia, and that all the lands in controversy were duly entered in his name on the land books of the proper counties, and that the taxes charged thereon were all paid by him up to and including the year 1873, thus correctly summarized the plaintiffs' proofs as to possession: " As to the possession of these lands by said Caperton, the evidence shows that as early as the month of April, 1865, one Solomon Taylor was in the actual possession and occupation of a part of the lands then owned by Caperton, as his tenant, and claiming his possession and occupation thereof as the tenant of Caperton. The lands so possessed and occupied by him were a part of the said Robert Morris tract purchased by Caperton, as above referred to. His improvements thereon consisted of a

log cabin, in which he lived, and a few acres of land enclosed, cleared, and cultivated by him, and had the appearance of being old. He remained on this land as tenant of Caperton until the year 1869, when he purchased from Caperton some 300 acres of the land formerly belonging to Morris, which embraced his said improvements. About the same time, in the spring of 1865, when Taylor was found in possession of said land, a man by the name of Thompson was on the lands acting as the agent of Caperton, locating and surveying them, and exercising supervision over them. In the spring of 1868 Caperton put Samuel Hinkle on that part of his said lands which were formerly a part of the Robert Morris tract, as his tenant and agent, and gave him the general charge of the whole of the lands then owned by him as above stated, with instructions to protect the timber thereon from waste and destruction, and to prevent squatters from settling upon them. Hinkle remained there as such tenant and agent of Caperton until the month of June, 1876, when Caperton died, and from that time to the institution of this suit he remained on said lands as the tenant of the plaintiffs. On the 8th day of July, 1874, George M. Sawyer, as the agent of Caperton, leased a portion of the land in controversy, lying on Williams River, to Mark Hammons, being the place where a man by the name of Mullen had once lived as a squatter, who took possession of the land under his lease, living there until he assigned it to M. J. Stiltner on the 14th day of May, 1875, and on the 21st of September, 1876, Stiltner assigned one-half of his leased premises to R. C. Clevenger, who entered upon the land, holding possession of the same until the spring of 1877, when he and Stiltner sold their tenancy to Peter Hammons, who took possession of the premises under them. The leased premises were afterwards occupied by Jesse Hammons, who derived his right from Peter Hammons, and he sold his right to John Lee, who entered upon the leased premises. All of these persons in law were the tenants of the plaintiffs, and of those under whom they claimed. It will be perceived that the constructive possession of the lands in controversy, under the proofs in this cause, in the absence of an actual, adverse pos-

session, which does not appear, was with the said Caperton up to the time that Taylor became his tenant of the lands mentioned above, and that the said Caperton had the actual possession of all of his said lands, at least from the month of April, 1865, to the time of his death, unless that possession was disturbed by the operations of the defendant, Rich, which commenced on the 10th day of May, 1872, by his lease to Mullens." *Braxton* v. *Rich*, 47 Fed. Rep. 178.

In considering the question of the possession of the various tracts of land claimed by the plaintiffs, as heirs at law of Caperton, the court below proceeded upon the ground that the surveys being coterminous all the tracts should be regarded as one tract. "Upon the question of adversary possession," the Supreme Court of Appeals of Virginia said in *Overton's Heirs* v. *Davisson*, 1 Gratt. 211, 224, " it is immaterial whether the land in controversy be embraced by one, or several coterminous grants of the older patentee; or one or several coterminous grants of the younger patentee: in either case, the lands granted to the same person by several patents, must be regarded as forming one entire tract." The same principle was announced in *Ewing* v. *Burnet*, 11 Pet. 41, 53, and in *Simmons Creek Coal Co.* v. *Doran*, 142 U. S. 417, 443.

This is substantially the case made by the plaintiffs. It would seem to be sufficient to sustain their claim to ownership of these lands, unless it has been overthrown by the evidence adduced by the defendants.

We proceed to examine the case made by the defendants, and the grounds upon which they assail the title of the plaintiffs. Certain tax deeds, under which the defendants claim, embrace the lands in dispute. The circumstances under which they were executed will now be stated.

John B. Shreve, a surveyor by occupation, had in his possession what he claimed was the original record of numerous surveys of lands in Randolph County, Virginia, made prior to the beginning of the present century. These lands were afterwards embraced in the present counties of Nicholas and Webster, West Virginia. He was well acquainted with the lines and corners of these old, and, as the evidence clearly

establishes, long abandoned surveys. He was probably the only person, living at the time of the transactions to be presently referred to, who could identify those corners and surveys. He conceived the idea of having the lands supposed to be within those abandoned surveys put on the assessor's book and sold for non-payment of taxes — the lands to be purchased by those who should employ him to identify and mark the lines of the original surveys.

In execution of this plan, but without any authority whatever in the premises from any one interested in the lands, Shreve, in 1868, addressed to the assessor of Webster County, West Virginia, a communication describing various tracts of land, aggregating nearly 700,000 acres, and directing him to put them all on the commissioner's books for purposes of taxation. Among those tracts he named the following:

1. "One tract in the name of William McClary, containing 100,000 acres," lying "on Gauley and Williams Rivers at the lower end of the county," Hally township. It does not appear that any one by the name of McClary ever had title to a tract of 100,000 acres by patent or otherwise, or that any such tract was ever surveyed by or for any person of that name. It does appear that a patent, dated January 21st, 1796, which was subsequent to the date of the Morris patent, was issued to William McCreery.

2. "One tract in the name of George Messingburg, containing 12,500 acres . . . on Gauley, at the upper end of the county, Fort Lick township." The survey for this land was made in 1795, but no patent ever issued to Messingburg or to any assignee. In other documents the name of this person is given as Messingbird.

3. "Fifty-three tracts in the name of Henry Banks, containing 58,500 acres . . ., laid off in 53 lots, the most lies east of Addison, Elk and Gauley, Fort Lick township." In 1787 Banks made fifty-three surveys, aggregating 58,500 acres of land, of which only forty-three were filed for patents. Of the surveys so filed, patents were issued for only nine, each covering one thousand acres. But those patents do not embrace any of the lands here in dispute.

4. "One tract in the name of James Welch, containing 105 acres in Fort Lick township."

To the paper sent by Shreve to the assessor was appended this memorandum: "Please place the following tracts on the books and them men will call on you and settle your fees liberally as my son told you. These lands in Webster County is covered sometimes three —— deep. If the owners choose to put them on the books at five cents per acre it will amount to thousands of dollars to the county as well as the State. As my son told you, you will be attended to. J. B. Shreve. P. S. — Leave with Mr. Sawyer what you have put them down at, so that I can write to those men what it is, etc. The rest lives in Pennsylvania."

"Those men," referred to in this postscript, were doubtless the persons residing out of the State, with whom Shreve made the first arrangement for putting on the assessor's books lands to be sold and which would be purchased by them at tax sales. But the arrangement with those persons seems to have been abandoned by them for some reason, and a different one was made with others. The latter arrangement is fully disclosed in the testimony, particularly in the depositions of Albert Owen and Benjamin Rich.

Albert Owen describes himself as a resident of Pennsylvania and a gentleman of leisure, who sometimes bought and sold real estate. It appears from his deposition that he had heard, in casual conversations, of a sale to be made in West Virginia in the autumn of 1869 of large bodies of land for delinquent taxes. And in May of that year he went to West Virginia and met John B. Shreve at the latter's residence in Upshur County. Shreve exhibited to him a large folio book of land surveys made between the years 1780 and 1795, and purporting to have been the work of Edward Jackson, a county surveyor, and his assistants or deputies. From their antiquated appearance they seemed to be the original book of surveys. Shreve claimed to have been shown by Jackson and his successors the original corners and landmarks of most of the surveys. The result of the meeting between Owen and Shreve was a written agreement by which the latter under-

took to assist the former in becoming familiar with the surveys prior to the proposed sale for taxes, and Owen agreed to pay Shreve $2000 for each one hundred thousand acres properly surveyed and identified by him, and purchased by Owen. Having made the above arrangement, Owen returned to his residence in Pennsylvania, and being without any money of his own proposed to some of his friends that if they would "find the expense money" he would attend the sale, make such purchases as he deemed advisable, and divide the profits with them. He made an arrangement with several persons, among whom was the present appellant, Benjamin Rich, that upon being furnished by them with one thousand dollars, he would attend the sale, and deliver to them one-half the proceeds of lands that should be purchased with the money supplied by them. But the parties with whom Owen made this arrangement, except Rich, withdrew from it early in September, 1869. Owen testified: "I think, about the 20th of September I went to Unionville to see these parties and see if they would carry out the arrangement that had been made. Each one would refer me to another, and they declined to furnish the money or to go with me except Benjamin Rich, who said if he could get ready and could raise some money, which he thought he could do, he would go with me and see what there was in the project. I then said to Rich, 'if you will make an effort, raise the money, go with me, and carry out your part of the contract, I will leave it optional with you after the sale to withdraw. I will refund your money and pay your expenses on the trip.' Rich said he would make the effort, but the time was short, but he thought he would go. Our time was limited in which to make the trip, but Rich met me at the train, and we proceeded to West Virginia and to Webster Court-house. We arrived there one or two days prior to the sale. Rich was present. John B. Shreve was present. Granville P. Shreve was present. Land agents and lawyers from many of the surrounding counties were present. The sale was had and was somewhat animated. I purchased a long list of tracts of land, large and small, bidding at random. . . . The amount paid by me, as receipted in this list,

is one hundred and fifty-four dollars and fifty-four cents ($154.54). Benjamin Rich and myself returned home together, and on our way, between Buckhannon and Clarksburg, I asked Rich which option he would take, his interest in the land or his money and expenses refunded. He said he would take his interest in the land. I then said to Rich, 'If you are not satisfied I will refund your money, pay your expenses, and give you ten dollars per day for the time you have lost.' Rich replied, 'If you will give me two thousand dollars I will step out.' That was understood to end the option, as it really did, and it was settled that he was to take his interest in the land."

The circumstances under which the appellant Rich became connected with these transactions were thus detailed by himself in a suit brought against him by Shreve: "I am the defendant in the above stated suit and reside at Unionville, Center County and State of Pennsylvania. I first met John B. Shreve, the plaintiff in the above stated cause, on September —, 1869, at Buckhannon, W. Va. Albert Owen, of Phillipsburg, Penna., introduced me to him. Owen had met Shreve some months before, and, as they both said, had been examining and surveying lands to be sold that fall for taxes. Shreve represented to me that he knew the beginning corners and lines of several large tracts of land that were to be sold in Webster County, West Virginia, that month; that he had the original plats and field-notes of Edward Jackson, the surveyor who made these surveys; that these corners and lines had been shown to him by Henry Jackson, he said, second surveyor of Randolph County, who was along with Edward Jackson when they were made. Shreve said that Henry Jackson was the second surveyor of Randolph County, and that he, Shreve, was deputy surveyor under him, and that he had nearly all of Henry Jackson's field-notes, and that he was the only man living that could show these corners and lines to identify these surveys. He also said that he had had the titles to these several tracts examined by one of the best land lawyers in the State (did not give his name); that he would show these corners and lines of these lands to the county sur-

veyor sufficient to identify any of these tracts and assist him or them in getting deeds and surveying the tracts of land if the party buying them would agree to pay him two cents per acre bonus. Owen had called my attention to these land sales some months before this and showed me a letter from John B. Shreve about the same as I have stated above. This letter and Owen's statement as to the lands, quality and quantity of timber, coal, etc., induced me to go to West Virginia at the time I did. . . . Then Shreve being so positive about his ability and willingness to identify these lands, I agreed to buy one tract, known as 'Col. Wm. McClary,' 100,000 acres; to pay 2000 dollars when I got the deed; corners and lines sufficient to identify it shown to me or county surveyor. I agreed to pay this two thousand dollars to John B. Shreve as a bonus for his information and services, as stated above. Owen, in my presence, agreed to take one tract of 105,000 acres, known as 'James Welch;' one of 187,000 acres, 'Joseph Patterson,' and some others. Shreve went with us to attend the sale. I bought the above tract, 'Col. Wm. McClary;' Owen bought several. In August, 1870, John B. Shreve came to my house in Unionville, Pennsylvania, and got me to take him to Phillipsburg, Pennsylvania, to see Mr. Owen. He said Owen was not paying him as he agreed. After a long talk between them Mr. Shreve agreed if I would take the 'Welch tract of 105,000 acres' he would wait on me for the bonus, $2100, until I could sell the land. I agreed to do that, and Owen assigned the sheriff's memorandum of the said tract to me at that time. I got the deed for the two tracts about the 1st of October, 1870."

On the 24th of September, 1869, there was a sale at the court-house in Webster County of the lands that Shreve had, for his individual purposes, caused to be put on the assessor's books for taxes for the year 1868. The tract of 58,500 acres, in the name of Henry Banks, was purchased by Owen, Rich, and G. P. Shreve (the latter a son of J. B. Shreve) for $11.20; the Messingbird or Messingburg 12,500 acres, by the same persons for $2.61; the McClary 100,000 acres, by Owen and Rich for $41.82; and the Welch 105,000 acres, by Owen for

$21.97. On the 28th day of September, 1870, James Woodzell, recorder of Webster County, who seems to have been, at that time, Rich's agent in land transactions in Webster County, executed deeds as follows: To Benjamin Rich and Thornton Conrow, assignee of Rich, for the 100,000 acres entered on the assessor's books and sold in the name of William McClary; to Rich and Conrow, assignee of Albert Owen and G. P. Shreve, for the Messingbird 12,500 acres; to Rich and Conrow, assignees of Owen, for the Welch 105,000 acres, and to Rich, assignee of Owen and G. P. Shreve, for the Banks 58,500 acres. It is unnecessary to refer to any deeds subsequently made, for they depend upon the validity of the tax sales of the above lands and upon the deeds made, as just stated, by the recorder of Webster County on the basis of those sales.

Were the tax sales of September 24th, 1869, of any validity whatever? The claims of the several defendants in this suit depend principally on the answer to that question.

The Code of Virginia in force prior to the creation of the State of West Virginia provided:

"§ 24. When any real estate is offered for sale [for taxes] as aforesaid, by the sheriff or collector, and no person present bids the amount to be satisfied from the sale thereof, the sheriff or collector *shall purchase the same on behalf of the Commonwealth for the taxes thereon*, and the interest on the same, and its proportion of the expense of advertising. A list of the real estate so purchased by the Commonwealth shall be made out by the sheriff or collector. After it shall have been verified by him on oath, the court of his county or corporation shall direct its clerk to make out a copy thereof, and deliver it to the commissioner of the revenue, and shall cause the original list to be certified to the first auditor. . . . § 25. The first auditor shall cause all the lists received in his office, under the preceding section, to be recorded in a well-bound book; and all the real estate mentioned in such lists shall, *without any deed for the purpose, stand vested in the Commonwealth.* § 26. The previous owner of any real estate so purchased for the Commonwealth, his heirs or assigns, or any person having a right to charge such real estate for a debt, may, until a further sale

thereof, as hereinafter mentioned, redeem the same by obtaining from the first auditor such certificate, and paying such fee therefor as is mentioned in the first section, and by paying into the treasury the amount for which such real estate was so purchased, with such additional sums as would have accrued for taxes thereon if the same had not been purchased for the Commonwealth, and interest at the rate of ten per centum per annum, on the former amount, from the date of the purchase, and on the additional sums, from the fifteenth of December, in the year in which the same would have so accrued. When real estate so purchased is so redeemed, the first auditor shall certify the fact to the proper commissioner of the revenue." Va. Code 1849, c. 37, §§ 24, 25, 26.

By an act of the general assembly of Virginia, passed February 3d, 1863, it was provided, among other things, that all property, real, personal, and mixed, owned by or appertaining to that Commonwealth, and being within the boundaries of the then proposed State of West Virginia, when the same became one of the United States, should pass to and become the property of West Virginia, without any other assignment, conveyance, transfer, or delivery than was contained in that act. Acts of Va. 1862–3, p. 64, c. 68.

The constitution of West Virginia, adopted in 1863, declared that "such parts of the common law and of the laws of the State of Virginia as are in force within the boundaries of the State of West Virginia, when this constitution goes into operation, and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the legislature." Art. XI, § 8. The effect of this constitutional provision was to make the above sections of the Code of Virginia part of the law of West Virginia from the time of the admission of the latter State into the Union.

The constitution of West Virginia of 1863 directed provision to be made by the legislature for the sale of all lands in that State, theretofore forfeited to Virginia for the non-payment of the taxes charged thereon for the year 1831, or for any year previous thereto, or for the failure of the former owners to have the same entered on the land books of the proper county

and charged with the taxes due thereon for that or for any year previous thereto, under the laws of Virginia, and also of all waste and unappropriated lands, by proceedings in the circuit courts of the county where such lands were situated. Art. IX, § 3. All lands within West Virginia, returned delinquent for non-payment of taxes to Virginia after 1831, when the taxes, exclusive of damages, did not exceed twenty dollars; and all lands forfeited for the failure of the owners to have the same entered on the land books of the proper county, and charged with the taxes chargeable thereon subsequent to 1831, where the tract did not contain more than one thousand acres, were released and exonerated from forfeiture, and from the delinquent taxes and damages charged thereon. Art. IX, § 4.

The fifth section of the same article provided: "§ 5. All lands in this State heretofore vested in the State of Virginia by forfeiture, or by purchase at the sheriffs' sales for delinquent taxes, and not released or exonerated by the laws thereof, or by the operation of the preceding section, may be redeemed by the former owners, by payment to this State of the amount of taxes and damages due thereon at the time of such redemption, within five years from the day this constitution goes into operation; and all such lands not so released, exonerated, or redeemed shall be treated as forfeited, and proceeded against and sold as provided in the third section of this article."

In execution of those provisions the legislature of West Virginia, on the 2d day of March, 1865, passed an act containing, among others, these provisions:

"SEC. 2. All lands in this State heretofore vested in the State of Virginia by forfeiture, or by purchase at the sheriffs' sales for delinquent taxes and not released or exonerated by the laws thereof, or by the operation of the seventh section of the ninth article of the constitution of this State, may be redeemed by the former owners by payment into the treasury of this State, upon the certificate of the auditor, of the amount of taxes and damages due thereon at the time of such redemption, on or before the twentieth day of June, eighteen hundred and sixty-eight.

"Sec. 3. All waste and unappropriated lands within this State, and all lands in this State heretofore vested in the State of Virginia by forfeiture or by purchase at the sheriffs' sales for delinquent taxes, not released and exonerated, or redeemed in the manner prescribed in the second section of this act, shall be sold for the benefit of the school fund, in the manner hereinafter directed." Acts W. Va. 1865, p. 79, c. 92.

From these statutory and constitutional provisions it appears: That by the law of Virginia, in force prior to the creation of the State of West Virginia, it was the duty of the sheriff or collector, when lands were sold for taxes, to purchase them on behalf of the Commonwealth for the amount of taxes, unless some person bid that amount; that any lands so purchased and certified to the first auditor vested in the Commonwealth without any deed for that purpose; that such lands could have been redeemed in the mode prescribed by the statute; that whatever title Virginia had to lands so purchased and not redeemed, and which were within the territory now constituting West Virginia, passed to the latter State upon its admission into the Union; and that the time given by the constitution and laws of West Virginia to redeem lands that had become the property of Virginia by forfeiture or by purchase at sheriffs' sale for delinquent taxes, and which had not been released or exonerated in conformity to law, expired June 20th, 1868.

The result is that the sale of the tract of 100,000 acres, put on the assessor's books in the name of William McClary, for the taxes of 1868, must be held to have been unauthorized by law. And such must be the result even if it be assumed that it was the same tract as that patented by Virginia to William McCreery on the 21st of January, 1796. From the records in the office of the auditor of public accounts of Virginia it appears that the tract of 100,000 acres in the name of William McCreery was charged on the land books of Nicholas County with taxes for the years 1840 to 1850 inclusive, and was returned delinquent for all of those years in the aggregate sum of $297.50, for which it was sold and purchased by the Commonwealth of Virginia in the year 1850. It had not been

redeemed in 1860, and after that year it disappeared from the land books of the county.

The title was in Virginia from and after the sale in 1850 for taxes, and that title passed to West Virginia on the admission of the latter State into the Union. The former owner was given, by the constitution of West Virginia, five years. from the day that instrument went into operation to redeem by paying the taxes and damages due the State. That time, as just stated, expired June 20th, 1868. There was no redemption. It was, therefore, beyond the authority of the assessor of Webster County to put the McClary or McCreery tract on the assessor's books as chargeable with taxes for the year 1868. It was then the property of the State of West Virginia, as between the State and all who claimed under the McCreery patent, and as such could neither be assessed nor sold as for taxes due the State. Laws of West Virginia, 1863, p. 161, § 36, Act of December 3, 1863. The assessment and sale were consequently void, and no rights passed to the purchasers.

Some effort was made to protect the claim of Rich and Conrow to own the McClary or McCreery tract of 100,000 acres in virtue of a sale made in 1871 for the taxes of 1870 under an alleged assessment upon this tract as the property of one "Viscount Clifford de Fleury." The deed made by the recorder to Rich and Conrow, dated October 3d, 1872, recited among other things that "the said tract of land was surveyed for Colonel William McClary on the 23d of April, 1795, the same having since been conveyed, as appears by sundry deeds. and conveyances now upon record in said county of Webster, showing that the same land was held in fee simple by Viscount Clifford de Fleury, but was sold on the 24th of September, 1869, in the name of William McClary, for the non-payment of taxes thereon for the year 1868 and previous years, and was purchased by Benjamin Rich, and the same conveyed to said Rich and Thornton Conrow by deed bearing date September 28th, 1870." It is a singular circumstance that not one of the "sundry deeds and conveyances" here referred to was produced in evidence. The proof tends strongly to show that the sale of 1871 for the taxes of 1870

was a fraudulent contrivance to overcome the inherent difficulties that were in the way of sustaining the sale of 1869 for the taxes of 1868. The sale of 1871 could not have legally occurred unless taxes were in fact chargeable on the lands, and the lands entered on the assessor's book for the taxes of 1870. The original land book of 1870 for Webster County upon which such entry would appear, if it was in fact duly made, could not be found at the time the evidence in this cause was taken, and the only book in existence — purporting to be a copy of that book containing the entry of 100,000 acres in the name of de Fleury — was the one in the possession of the state auditor. Upon that copy appeared, for the first time in any land book of Webster County, a tract of 100,000 acres "in the name of Fleury, Viscount Clifford de, for the year 1870." And the entry in that copy was not in its alphabetical order, but out of its natural place, between the letters M. and N, and in a different handwriting from the handwriting on the same page, except the footings. The county clerk of Webster County testified that upon examination of the assessor's land book in his office for the year 1870 he could not find any land charged thereon in the name of Viscount Clifford de Fleury. Without further reference to the proofs on this point, it is sufficient to say that, according to the weight of the evidence, this land was never duly entered in the name of de Fleury upon the land books of the proper county preceding the sale in 1871 for the taxes of 1870; that that sale was a mere sham; and that no rights accrued to the purchasers by reason of it.

Nor did any title pass by the purchase at the tax sale of September 24th, 1869, of the Messingbird or Messingburg tract of 12,500 acres. That tract, it is true, appeared to have been surveyed in 1795, but the survey was never filed in the land office of Virginia, and no patent was ever issued. The Welch tract was also surveyed in the same year, but no patent, based on that survey, appears to have been issued. The placing of these tracts, upon the books of Webster County, as the lands of private persons, claiming under the Messingbird and Welch surveys, but having no title to the lands, was, therefore, unau-

thorized by law, and no right to such lands was acquired by the tax sale of 1869. What has been already said in respect to the Banks 58,500 acres tract is sufficient to dispose of that part of the case, namely, that grants were issued for only nine of the forty-three contiguous surveys made in the name of Banks, and that none of the lands claimed by the plaintiffs are within the boundaries of the surveys patented.

In reference to the claim of some of the defendants to own a portion of the Welch tract, in virtue of a tax sale in 1875 of 63,734 acres, in the name of Francis Hyland, the court below found from the evidence that no such survey was ever filed in the land office of Virginia; that no grant was ever issued thereon; and that no such tract was ever charged with taxes on the land books of either State. We perceive no reason to doubt the accuracy of this finding. From such a sale no title could be derived.

But the defendants insist that, independently of any question involving *their* respective claims to the lands in dispute, the plaintiffs themselves have no title that will authorize any decree in their behalf. We have seen that in 1875, in the lifetime of Allen T. Caperton, the lands in dispute, having been returned delinquent for the non-payment of the taxes due thereon, were sold by the proper officer, and purchased by the State of West Virginia, and the title thereto, without deed and by virtue of the statute, vested at once in the State. There was no formal redemption by Caperton, who died within less than a year after such sale; and it is insisted that his *heirs* could not redeem under the laws of West Virginia, at least after the expiration of one year from the purchase by the State. In that view, it is contended that the proceedings hereinbefore referred to, and which were instituted in 1881 in the circuit courts of Webster and Nicholas Counties by the heirs of Caperton, were ineffectual to restore title; in which case his heirs could not claim the lands, nor invoke the aid of a court of equity, whatever might be the invalidity of the claims asserted by the defendants. Let us see whether this contention is justified by any reasonable interpretation of the statutes of West Virginia.

By the constitution of West Virginia, adopted in 1872, Article XIII, it was provided :

"Section 4. All lands in this State, waste and unappropriated, or heretofore or hereafter for any cause forfeited, or treated as forfeited, or escheated to the State of Virginia, or this State, or purchased by either and become irredeemable, not redeemed, released, transferred, or otherwise disposed of, the title whereto shall remain in this State till such sale as is hereinafter mentioned be made, shall, by proceedings in the Circuit Court of the county in which lands or part thereof are situated, be sold to the highest bidder.

"Section 5. The former owner of any such land shall be entitled to receive the excess of the sum for which the land may be sold over the taxes charged or chargeable thereon, or which, if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve per centum per annum, and the costs of the proceedings, if his claim be filed in the Circuit Court that decrees the sale, within two years thereafter."

In order to carry out these constitutional provisions, the legislature of West Virginia passed the act of April 9th, 1873, c. 117, entitled " An act to amend and reënact chapter thirty-one of the Code of West Virginia, concerning the sale of real estate for taxes; forfeiture for non-payment and non-assessment of taxes, and the transfer of title vested in the State." Acts W. Va. 1872–3, p. 308.

This act provides for the sale of lands for taxes, and gives " the owner of any real estate so sold, *his heirs or assigns,* or any person having a right to charge such real estate for a debt," the right to " redeem the same by paying to the purchaser, his heirs or assigns, within one year from the sale thereof, the amount specified in the receipt mentioned in the tenth section, [being the receipt given by the sheriff or collector to the purchaser,] and such additional taxes thereon as may have been paid by the purchaser, his heirs or assigns, with interest on said purchase money and taxes at the rate of twelve per centum per annum from the time the same may have been so paid." § 15. Infants, married women, insane per-

sons, or persons imprisoned, whose real estate may have been sold during their respective disabilities, were given the right to redeem within one year after such disability was removed. § 30. If no person present at the sale bid the amount to be satisfied to the State, it was made the duty of the sheriff or collector to purchase on behalf of the State for the taxes, with interest and damages due thereon — making out a list of such purchases to be transmitted to the auditor and recorded, and the title vesting in the State, subject, however, to the right of redemption as prescribed in the same statute. §§ 31, 32. The right of redemption was to be exercised, within one year from the sale, by " the previous owner of any real estate so sold and purchased for the State, *his heirs or assigns*, or any person having a right to charge it for a debt." § 33. The statute also prescribes the mode in which the redemption may be effected by " any person having a right to redeem any tract or lot of land purchased by the State at a sale thereof for the non-payment of the taxes thereon." § 34. Another section provides : " When real estate so purchased is so redeemed, the auditor shall certify the fact of such redemption to the proper assessor, and it shall thereupon be the duty of such assessor to reënter the same upon the land books of the county or district in the name of the former owner thereof, or in case the same has been conveyed by deed to any other person, to enter the same in the name of the grantee in such deed. But such redemption shall not prejudice any claimant of such land or any part thereof, who may have acquired the State's right thereto by the constitution or former laws of the State." § 38.

In the same year, November 18th, 1873, was passed the act heretofore referred to, providing for the sale of escheated, forfeited, and unappropriated lands for the benefit of the school fund. That act, which amended and reënacted chapter 105 of the Code of West Virginia, provided :

" SEC. 1. All waste and unappropriated lands within this State, and all lands in this State heretofore vested in the State of Virginia by forfeiture or purchase at the sheriff's or collector's sale for delinquent taxes and not released and exonerated or redeemed within one year according to law ; all lands

heretofore or hereafter purchased for this State, at a sale thereof for taxes, and not redeemed within one year, according to law, and all lands forfeited to this State for the failure to have the same entered upon the books of the assessor and charged with the taxes thereon, as provided for by law, shall, so far as the title thereof shall not be vested in junior grantees or claimants under the provisions of the Constitution and laws, be sold for the benefit of the school fund, in the manner hereinafter prescribed. The auditor shall certify to the clerk of the county court a list of all such lands, which, or the greater part of which, lie in his county, within sixty days after the title thereto shall vest in the State." Acts W. Va. 1872–3, c. 134, pp. 449, 450.

It was made the duty of circuit courts to appoint for each county of their respective circuits a commissioner charged with the duty of selling, under the direction of the court, lands of the character named in the statute.

The act further provided : " Sec. 12. The former *owner* of any such land, shall be entitled to recover the excess of the sum for which the land may be sold over the taxes charged and chargeable thereon, or which if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve per centum per annum, and the costs of the proceedings; if his claim be filed in the circuit court that decrees the sale, within two years thereafter, as provided in the next section. Sec. 13. Any such *owner* may within the time aforesaid, file his petition in the said circuit court stating his title to such lands, accompanied with the evidences of his title and upon such full and satisfactory proof that at the time the title to said lands vested in the State, he had a good and valid title thereto, legal or equitable, superior to any other claimant thereof. Such court shall order the excess mentioned in the next preceding section to be paid to him ; and upon a properly certified copy of such order being presented to the auditor, he shall draw his warrant on the treasury in favor of such owner or his personal representative for such excess. *At any time before the sale* of any such land as hereinbefore mentioned, *such former*

*owner* or any creditor of such former owner of such land, having a lien thereon, may pay into court by and with the consent of the court, all costs, taxes, and interest due at the time, as provided for in section twelve of this chapter, and have an order made in the order book of such court describing the amount paid in as well as the character of his claim to said land, which order so made shall operate as a release of all former taxes on said land, and no sale thereof shall be made : Provided, That such payment shall in no way affect or impair the title to any portion of such land transferred to and vested in any person, as provided in section three of article thirteen of the constitution." Acts W. Va. 1872–3, pp. 454–5.

It will be observed, from an examination of the acts of April 9th, 1873, and November 16th, 1873 : That in the case of real estate sold for taxes, of which the State became the purchaser, the first-named act gives " the *owner* of any real estate . . . his *heirs or assigns* or any person having a right to charge such real estate for a debt," the right to redeem within one year from the sale ; and that in the case of proceedings instituted by the school commissioner in the circuit court to sell, for the benefit of the school fund, land of which the State had become the purchaser, the last act gives " the former owner of any such land " the right to recover the excess for which it may be sold " over the taxes charged and chargeable thereon," if his claim be asserted, in such court, by petition filed within two years after any sale under its orders, and accompanied by proof of title.  But the latter act also gives to " such former owner or any creditor of such former owner of such land " the right to redeem " *at any time before the sale* " that may be ordered by the circuit court for the benefit of the school fund.

Now the point made by the defendants is that although Caperton, if he had lived, could have redeemed at any time before such sale, his *heirs* could not redeem at all under the act of November 16th, 1873, because that act makes no express reservation for *their* benefit, and does not, in terms, allow any one except the former owner, or some creditor of his having a lien on the land, to take advantage of its provisions.

We have not been referred to any decision of the Supreme Court of Appeals of West Virginia, placing any such interpretation upon the above statutes. None of the cases cited by counsel for the defendants sustain the proposition that the heirs of the former owners were excluded from the beneficent provisions of the act of November 16th, 1873. *McClure* v. *Maitland*, 24 W. Va. 561, only decides that proceedings instituted under that act, for the benefit of the school fund, were, in a judicial sense, *ex parte*, and were neither *in rem* nor *in personam;* neither against the land nor against the former owners. In that case it was held that as the title had vested absolutely in the State, the right to redeem was simply of grace, and must be exercised in the form prescribed by the statute. This principle was recognized by the Circuit Court of the United States for the District of West Virginia in *De Forest* v. *Thompson*, 40 Fed. Rep. 375, 378, (reported in 32 W. Va. App. p. 1, under the title of *Wakeman* v. *Thompson*,) and subsequently by the United States Court of Appeals for the Fourth Circuit in *Read* v. *Dingess*, 8 C. C. App. 526, 539. The full extent of the decision in *McClure* v. *Maitland* is indicated by the subsequent case of *Waggoner* v. *Wolf*, 28 W. Va. 820, 827, in which the court said: " In *McClure* v. *Maitland*, 24 W. Va. 561, this court decided, that as soon as the title to the land became forfeited and vested in the State, according to the aforesaid provisions of the constitution, the ownership of the State became absolute, and her title perfect, and that the former owner then ceased to have any title, claim, right, or interest whatever in the land as such owner, and that the only right conferred upon him by the said fifth section of the constitution was to be paid the excess of the proceeds of the sale over the amount of the taxes, in the manner therein prescribed. In that case no petition was filed or offer made to redeem the land. The effort there was to have the sale of lands already made set aside at the instance of Maitland, the former owner. Therefore no question was presented or considered in that case as to the right of the former owner to redeem the land before sale by the school commissioner; nor was the power of the legislature to authorize such redemption

before sale either referred to or discussed by the court in its opinion. The question as to such authority is now for the first time presented to this court." Neither of these cases involved any question as to the right of the heirs of the former owner to redeem prior to any sale based on a petition filed by the school commissioner under the act of November 16th, 1873.

In the absence of any direct decision of the state court upon this subject, we are not willing to construe the statutes in question as cutting off the right of the heirs of the former owner — the latter dying before the expiration of the time (one year) allowed for redemption by the act of April 9th, 1873 — to secure the release of his lands from all former taxes, and thereby to prevent such lands from being sold for the benefit of the school fund, as prescribed by the act of November 16th, 1873. It is quite true that upon the sale on the 26th of September, 1875, of the lands here in question (standing on the land records in the name of Caperton) the title, by virtue of the statute, passed to the State upon its purchase of them, and that title became indefeasible upon the expiration of one year without redemption. But it is clear, from the express words of section 33 of the act of April 9th, 1873, that the *heirs* of Caperton, he having died before the expiration of one year, could *within that year* have redeemed in the mode prescribed by that act. If there was no redemption, within the time named, the title remained in the State until the lands were sold under proceedings instituted in the proper circuit court of the county by the school commissioner. Section 13 of the act of November 16th, 1873, was in the direction of liberality and forbearance towards those whose lands had been taken for taxes. And in the condition of the land titles of the State, there was every reason why the State should enable those who, but for the sale at which it purchased, would, under the law, be the owners of the lands, to have them released from " all former taxes," provided they moved in the matter before the lands were actually sold by direction of the Circuit Court in the proceedings instituted by the commissioner of school lands.

The words "former owner" in section 13 of the last act embrace those who, in law, would have owned the lands, upon

the death of such owner, if they had not been sold for taxes, or, if sold, had been redeemed within the prescribed time after the sale at which the State purchased.  If the heirs of Caperton had redeemed the lands on the last day of the year within which the State permitted redemption from the original sale for taxes, the title, which vested in the State by its purchase, would, under the act of April 9th, 1873 have been at once rein-vested in them without any deed, from the State, or without the execution of any instrument except a certificate showing the payment of what was due the State.  And if Caperton had been alive during the proceedings instituted by the school commissioner in the Circuit Court, his right, under the act of November 16th, 1873, to redeem *at any time before a sale under the order of the court,* for the benefit of the school fund, could not be, indeed, is not questioned.  It is inconceivable that the legislature intended to deny that privilege to his heirs, who succeeded to whatever rights he had in respect to these lands.  What the State wished was the payment of its taxes and all damages due for the failure to pay them at the proper time.  No considerations of public policy can be suggested in support of the contention, based upon the mere letter of the statute, that there was a purpose to withhold from the heirs of the former owner the privilege of redemption given to the ancestor.  The two statutes of 1873 are *in pari materia,* and must be construed together in order to ascertain the intention of the legislature.

Much stress is placed by the defendants upon the reservations made in the acts of April 9th, 1873, and November 16th, 1873, of the rights previously vested under section 3 of Article XIII of the state constitution.  They claim to have had rights of that character at the time these lands were forfeited for the non-payment of taxes by Caperton, and that those rights became complete and unassailable before the redemption by Caperton's heirs in 1881.  By that section of the state con-stitution, hereinbefore set out, the title to lands of the character described which were not redeemed, released or otherwise disposed of, and which was vested in and remained in the State, was transferred to and vested —

1. In any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much thereof as such person shall have had actual, continuous possession of under color or claim of title for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such possession; or,

2. If there were no such person, then to any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much of said land as such person shall have title to, regularly derived, mediately or immediately, from or under a grant from the Commonwealth of Virginia, which, but for the title forfeited, would be valid, and who, or those under whom he claims, has or shall have paid all state taxes charged or chargeable thereon for five successive years after the year 1865, or from the date of the grant, if it was issued after that year; or,

3. If there were no such person as aforesaid, then to any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees) for so much of said land as such person shall have had claim to and actual, continuous possession of, under color of title, for any five successive years after the year 1865, and have paid all state taxes charged or chargeable thereon for said period.

The defendants' case cannot be deemed to belong to the first or third of these classes, for the reason, if there were no other, that the evidence fails to show actual, continuous possession for ten years, or for five successive years after 1865, under color or claim of title. We concur with the learned District Judge in holding that the defendants "have failed by any evidence to prove the possession of this land, before the suit was brought, for five consecutive years. The possession attempted to be set up was of such a transitory character as to be utterly unreliable. It was not the actual, continuous possession for five consecutive years contemplated by the constitution." The evidence of the principal witnesses for the defendants was, as the court below well said, "lacking in all of those

essential elements that go to make up a continuous adverse possession or holding."

Nor can the defendants bring themselves within the second of the above classes described in section three of article thirteen of the state constitution. In cases of that class possession is not required ; but title, regularly derived, was required. Assuming the correctness of what has been said in reference to the title asserted by the defendants, and which need not be here repeated, it is idle to say that they had title to any part of the lands claimed by the plaintiff, " regularly derived," mediately or immediately, from or under a grant either from Virginia or from West Virginia.

Upon the question of the jurisdiction of a court of equity to give the relief sought by the bill, but little need to be said. In *Simpson* v. *Edmiston*, 23 W. Va. 675, 678, the court said that it had been repeatedly held that a court of equity has jurisdiction to set aside an illegal tax deed — citing *Forqueran* v. *Donnally*, 7 W. Va. 114; *Jones* v. *Dils*, 18 W. Va. 759; and *Orr* v. *Wiley*, 19 W. Va. 150. And in *Danser* v. *Johnson*, 25 W. Va. 380, 387: "It is fully settled in this State that a court of equity has jurisdiction to set aside a void tax deed." These authorities make it clear that if this case had remained in the state court no objection could have been made to the form of the suit. But as the jurisdiction of the courts of the United States, sitting in equity, cannot be controlled by the laws of the States or the decisions of the state courts — except that the courts of the United States, sitting in equity, may enforce new rights of an equitable nature created by such laws, *Clark* v. *Smith*, 13 Pet. 195 ; *Holland* v. *Challen*, 110 U. S. 15 — it is proper to say that, according to settled principles, the plaintiffs were entitled to invoke the aid of a court of equity.

The principal ground upon which the contrary view is rested by the appellants is, that the bill assails the tax deeds under which they claim as fraudulent, void, and inoperative. And to support this view several adjudged cases are cited, some of which hold that where the title is merely legal, and where the validity of one title or the invalidity of another

clearly appears on the face of documents that are accessible, and no particular circumstances are stated, showing the necessity for interference by equity, either for preventing suits or other vexation, the remedy is at law. *Hipp* v. *Babin*, 19 How. 271; *Whitehead* v. *Shattuck*, 138 U. S. 146, 156; *Scott* v. *Neely*, 140 U. S. 106, 110; *Smyth* v. *N. O. Canal & Banking Co.*, 141 U. S. 656, 660. The principle is thus stated by Mr. Justice Story: "Where the illegality of the agreement, deed, or other instrument appears upon the face of it, so that its nullity can admit of no doubt, the same reason for the interference of courts of equity to direct it to be cancelled or delivered up, would not seem to apply; for, in such a case, there can be no danger that the lapse of time may deprive the party of his full means of defence; nor can it, in a just sense, be said that such a paper can throw a cloud over his right or title, or diminish its security; nor is it capable of being used as a means of vexatious litigation, or serious injury." 1 Eq. Juris. § 700 *a*.

These authorities do not control the present question. It must be remembered that "it is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *Boyce* v. *Grundy*, 3 Pet. 210, 215; *Drexel* v. *Berney*, 122 U. S. 241, 252; *Allen* v. *Hanks*, 136 U. S. 300, 311. And the applicability of the rule depends upon the circumstances of each case. *Watson* v. *Sutherland*, 5 Wall. 74, 79. In the case now before us it cannot be said that the invalidity of the deeds which the plaintiffs seek to have cancelled appears on their face. It is not clear that their invalidity can be placed beyond question or doubt, without evidence *dehors* those deeds.

Besides, by the laws of West Virginia the tax deeds under which the defendants claim are *prima facie* evidence against the owner or owners, legal or equitable, of the real estate at the time it was sold, his or their heirs or assigns, and all other persons who might have redeemed the same within the time prescribed by law, and conclusive evidence against all other persons, that the material facts recited in them are true. Code

of W. Va. 1868, c. 31, § 29; Acts of W. Va. 1872–3, c. 117, § 29; Code of W. Va. 1891, c. 31, § 29. Mr. Pomeroy, in his Treatise on Equity Jurisprudence, while recognizing it to be the general rule, established by the weight of authority, that equity will not interfere to remove a cloud from title "where the instrument or proceeding constituting the alleged cloud is absolutely void on its face, so that no extrinsic evidence is necessary to show its invalidity," or "where the instrument or proceeding is not thus void on its face, but the party claiming, in order to enforce it, *must necessarily* offer evidence which will *inevitably* show its invalidity and destroy its efficacy" — which doctrine, he says, often operates to produce a denial of justice — correctly says that equity will interfere where deeds, certificates, and other instruments given on sales for taxes are made by statute *prima facie* evidence of the regularity of proceedings connected with the assessments and sales. 3 Pomeroy's Eq. Jur. § 1399, and note 1, p. 437, and authorities there cited. And this view is sustained by numerous adjudged cases. *Huntington* v. *Central Pacific Railroad*, 2 Sawyer, 503, 514; *Allen* v. *City of Buffalo*, 39 N. Y. 386, 390; *Palmer* v. *Rich*, 12 Michigan, 414, 419; *Marquette, Houghton & Ontonagon Railroad* v. *Marquette*, 35 Michigan, 504; *Milwaukee Iron Co.* v. *Town of Hubbard*, 29 Wisconsin, 51, 58; *Weller* v. *City of St. Paul*, 5 Minnesota, 95; *Pixley* v. *Huggins*, 15 California, 127; *Tilton* v. *O. C. M. R. Co.*, 3 Sawyer, 22. See also 2 Blackwell on Tax Titles, § 1066, and authorities cited. In the present case there are no defects of a controlling character that distinctly appear on the face of the tax deeds under which the defendants claim title. And as those deeds are made by statute *prima facie* evidence of title in the grantees named in them; and as, therefore, the plaintiffs, if sued in ejectment by the defendants, would be compelled, in order to defeat a recovery against them, to resort to extrinsic evidence in support of their title, the deeds in question constitute a cloud upon that title, to remove which the plaintiffs may rightfully invoke the aid of a court of equity.

The decree is                                                 *Affirmed.*