## CRAIGHILL *v.* VAN RISWICK.

Rock Creek Park ; Special Assessments for Benefits ; Jurisdiction ; Constitutional Law.

1. Sec. 3224, R. S. U. S., providing that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court," *held* not apply to a suit in equity to enjoin the Rock Creek Park Commissioners from levying a special assessment under the act of Congress of February 7, 1890 (26 Stat. 492), against property decided by them to be benefited by the establishment of Rock Creek Park in this District.
2. As that act makes such an assessment by the Park Commissioners a lien upon the land assessed and precludes inquiry into the regularity and validity of the antecedent proceedings, their action in so assessing operates to cast a cloud upon the title of property assessed, in respect of which the owners can have adequate relief only in equity.

3. When a suit against the Park Commissioners to restrain such an assessment was brought before the Commissioners had definitely fixed the amount of the assessment, but after an announcement of their determination so to assess, it was *held* that the suit was not prematurely brought, especially as the defendants waived such defence.

4. The special jurisdiction conferred upon the Supreme Court of this District by the act of February 7, 1890, providing for the acquisition of land for Rock Creek Park, and for the assessment of land specially benefited by the location of the park, "to hear and determine all matters connected with said assessment," *held* not to oust that court of its general equity jurisdiction in a suit to enjoin the levying of such an assessment, or this court of its appellate jurisdiction in such a case.

5. Sec. 6 of the act of February 7, 1890, imposing a special assessment on the lands adjoining Rock Creek Park for supposed benefits, for the purpose of paying the cost and expense of the park, is unconstitutional and void.

6. That section of the act also *held* to be so inconsistent and meaningless as to render it impossible to determine its meaning with certainty and to properly execute it.

No. 521.   Submitted February 18, 1896.   Decided March 17, 1896.

HEARING on an appeal by the Rock Creek Park Commissioners from a decree enjoining them from levying a special assessment on certain lands, under the act of Congress of February 7, 1890. *Affirmed;* Mr. Chief Justice ALVEY dissenting.

The COURT in its opinion stated the case as follows:

This is an appeal from a decree in equity of the Supreme Court of the District of Columbia awarding an injunction against the Rock Creek Park Commissioners to restrain them from levying an assessment on certain lands of the appellees adjoining the park for supposed benefits accruing to the lands from the location of the park.

By an act approved February 27, 1890 (26 Stat. 492), Congress provided for the acquisition by the United States of a certain tract or tracts of land, within certain specified limits, extending along both sides of Rock Creek, in the District of Columbia, to be " perpetually dedicated and set

apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States, to be known by the name of Rock Creek Park," with the proviso that the whole tract to be acquired should not exceed 2,000 acres, nor the total cost thereof the sum of $1,200,000, which sum was appropriated by the act to be used in payment for the land and for the incidental expenses of its acquisition.

Provision was made in the act for the appointment of the Engineer-in-chief of the Army, the Engineer Commissioner of the District of Columbia, and three citizens to be appointed by the President of the United States, as a commission to locate the park; to prepare an accurate map thereof, which should show the location, quantity, and character of each parcel of private property that might be required, with the names of the respective owners inscribed thereon; to cause such map to be recorded among the public records of the District of Columbia; and thereafter to conduct the proceedings for the acquisition of the land, which was to be secured either by purchase or by condemnation. It was provided farther that, upon the recording of the map, the several tracts of land therein embraced should "be held as condemned for public uses, and the title thereof vested in the United States, subject to the payment of just compensation, to be determined by said commission and approved by the President of the United States;" and also that, if the commission should be unable to reach an agreement with the respective owners, "to purchase all of the land so selected within thirty days after such condemnation at the price approved by the President of the United States," it should, at the expiration of that period, "make application to the Supreme Court of the District of Columbia by petition, at a special or general term, for an assessment of the value of such land as it has been unable to purchase," with a description thereof, specification of the owners, &c. It was made the duty of the court, upon the filing of such petition, to appoint three commissioners to

appraise the value of the land therein mentioned, and upon such appraisement to determine the value; also to direct the time and manner in which possession of the condemned property should be taken.   And provision was made that, when the President of the United States, who was also authorized to intervene in the matter, should decide the valuation to be reasonable, payment should thereupon be made to the owners, and the United States should be deemed to have a valid title to the land.   In the event of the refusal of the owner to take the amount of the valuation, or in the event of difficulty in regard to the title, the money was to be paid into court.   Upon the payment of the money or the deposit thereof in the contingencies mentioned, possession was to be taken for the United States.   One-half of the cost and expenses was to be reimbursed to the United States, out of the revenues of the District of Columbia.

It was then provided by section 6 of the act, which is the part of the statute that has given rise to the present controversy, that the commission should proceed to make an assessment for special benefits on such property in the District of Columbia as would be benefited by the location and improvement of the park; and the mode was prescribed by which the assessment was to be made and enforced.   This section, with the omission of such parts as are unnecessary to the present controversy, is as follows:

"Sec. 6. That the commission having ascertained the cost of the land, including expenses, shall assess such proportion of such cost and expenses upon the lands, lots, and blocks situated in the District of Columbia specially benefited by reason of the location and improvement of said park, as nearly as may be, in proportion to the benefits resulting to such real estate.

"If said commission shall find that the real estate in said District directly benefited by reason of the location of the park is not benefited to the full extent of the estimated cost and expenses, then they shall assess each tract or parcel of land specially benefited to the extent of such benefits as

they shall deem the said real estate specially benefited. * * * When the assessment shall be completed, it shall be * * * filed in the office of the clerk of the Supreme Court of the District of Columbia. The commission shall apply to the court for a confirmation of said assessment, giving at least ten days' notice of the time thereof by publication in one daily newspaper published in the city of Washington, which notice shall state in general terms the subject and the object of the application.

" The said court shall have power, after said notice shall have been duly given, to hear and determine all matters connected with said assessment; and may revise, correct, amend, and confirm said assessment, in whole or in part, or order a new assessment in whole or in part, with or without further notice, or on such notice as it shall prescribe ; but no order for a new assessment in part, or any partial adverse action, shall hinder or delay confirmation of the residue, or collection of the assessment therefrom. Confirmation of any part of the assessment shall make the same a lien on the real estate assessed.

" The assessment when confirmed, shall be divided into four equal installments, and may be paid by any party interested in full or in one, two, three, and four years, on or before which times all shall be payable, with six per centum annual interest on all deferred payments. All payments shall be made to the Treasurer of the United States, who shall keep the account as a separate fund. The orders of the court shall be conclusive evidence of all previous proceedings necessary to the validity thereof, and of all matters recited in said orders. The clerk of said court shall keep a record of all proceedings in regard to said assessment and confirmation. * * * In case assessments are not paid as aforesaid, the book of assessments certified by the clerk of the court shall be delivered to the officer charged by law with the duty of collecting delinquent taxes in the District of Columbia, who shall proceed to collect the same as delinquent real estate taxes are collected.

. " All money so collected may be paid by the Treasurer on the order of the commission to any persons entitled thereto as compensation for land or services. Such order on the Treasurer shall be signed by a majority of the commission and shall specify fully the purpose for which it is drawn. If the proceeds of assessment exceed the cost of the park, the excess shall be used in its improvement, under the direction of the officers named in section 8, if such excess shall not exceed the amount of $10,000. If it shall exceed that amount that part above $10,000 shall be refunded ratably. Public ~ officers performing any duty hereunder shall be allowed such fees and compensation as they would be entitled to in like cases of collecting taxes. The civilian members of the commission shall be allowed ten dollars each per day for each day of actual service. Deeds made to purchasers at sales for delinquent assessments hereunder shall be *prima facie* evidence of the right of the purchaser, and any one claiming under him, that the real estate was subject to assessment and directly benefited, and that the assessment was regularly made ; that the assessment was not paid ; that due advertisement had been made ; that the grantee in the deed was the purchaser or assignee of the purchaser, and that the sale was conducted legally.

" Any judgment for the sale of any real estate for unpaid assessments shall be conclusive evidence of its regularity and validity in all collateral proceedings, except when the assessment was actually paid ; and the judgment shall estop all persons from raising any objection thereto, or to any sale or deed based thereon, which existed at the date of its rendition, and could have been presented as a defence to the application for such judgment."

In pursuance of this act the Park Commission was duly appointed and entered upon the performance of its duties. It selected the land, and filed and recorded a map of it. Some of the tracts comprised in the map were acquired by purchase in pursuance of agreement with the owners ; and

for the acquisition of the other tracts, in reference to which agreement could not be had, a petition was filed in the Supreme Court of the District in accordance with the requirements of the act for an appraisement of their value and their condemnation to the use of the United States.

Appraisers were appointed by the court. Upon the return of their report, it was found that the appropriation was not sufficient to pay for all the land selected, and some of the tracts were excluded, therein comprising two parcels, designated on the map as 13 and 16, belonging to the appellees in this cause. The money for the tracts that were taken was paid into court.

The proceedings in court for the acquisition of the lands not purchased by agreement were contested by some of the owners upon various grounds ; and the proceedings were finally carried to the Supreme Court of the United States upon writ of error.

There the decision of the Supreme Court of the District of Columbia upon the petition filed by the Park Commissioners was affirmed. *Shoemaker* v. *United States*, 147 U. S. 282. Thereafter the fund in court was paid out to the respective owners upon reports of a special auditor ; the lands became the property of the United States ; and the park was finally established and turned over to the control of the officers named in the seventh section of the act to take charge of it, namely, the Chief of Engineers of the United States Army and the Commissioners of the District of Columbia.

Apparently, however, the duties of the Park Commissioners were not yet at an end. They were required by section 6 of the act to make an assessment for special benefits accruing by reason of the establishment of the park ; and this they now proceeded to perform. They gave public notice of their intention to assess under this section ; and announced that, on a day designated, they would first hear testimony as to the extent of surrounding land affected beneficially by the location and improvement of the park.

The appellees and others, who were owners of adjoining lands, appeared and entered a protest against any proceeding by the commission to make any such assessment as they had proposed to make, on the ground that the land had already been taken and paid for, and no assessment was required for any further payment; that the only purpose of assessment, as specified, was to pay for the land and expenses, all of which already had been defrayed; that the powers and duties of the commission were at an end; that no special benefits had accrued to any of the lands in question, inasmuch as there had been no improvement whatever of the proposed park, and no change whatever from the previous conditions; that the section of the act in regard to assessment was conflicting, meaningless, and unintelligible, and therefore incapable of enforcement; and that the principle of assessment for supposed benefits in such cases was erroneous and radically vicious.

The commission thereupon was adjourned for a time, it was understood, in order to take the opinion of the Attorney-General of the United States on the question raised. This opinion the Attorney-General declined to give; and it was supposed that the commission would then proceed with the work of assessment.

At this juncture the appellees commenced the present proceedings by filing their bill in equity in the Supreme Court of the District of Columbia to restrain the commissioners, by injunction, from further action in the way of levying an assessment on the property of the complainants; and the claim was set up that section 6 of the act was repugnant to the Constitution of the United States, and therefore void.

To this bill a demurrer was filed by the United States District Attorney as solicitor for the Park Commissioners; and the demurrer was sustained on the ground that the application for injunction was premature. The cause was retained, however, with leave to the complainants to renew their application by supplemental bill or otherwise at a later stage of the proceedings of the Park Commissioners.

The Park Commissioners continued to hold their sessions; and on February 21, 1895, formally announced that they deemed certain property lying within a quarter of a mile from the limits of the park to have been specially benefited by reason of the location of the park. They decided that, saving some exceptional cases, which the commission was not then ready to consider, there had been no special benefit accruing by reason of the location and improvement of the park to any land within the District of Columbia situated more than a quarter of a mile in any direction beyond the nearest park limits; but that the testimony thus far taken had established the fact, in their opinion, that certain properties within a quarter of a mile from the park and abutting upon it had been specially benefited. The only tract, however, that was specially designated by the commissioners as so benefited was tract No. 16, hereinbefore mentioned, the property of the appellees, which was held by them to have "been benefited by the location of the park, not only because of its proximity thereto, but because of its overlook of the park." No special sum of money was named as the amount of the supposed benefit, and there was no formal assessment of value, at least at that time. The designation was made in order to give the appellees a standing in court in the suit instituted by them, it being the avowed desire of the commissioners to have their powers and duties in the premises authoritatively defined for them by the court, as well as the rights of the complainants in the suit and other adjoining owners fully determined.

The appellees thereupon filed a supplemental bill, in which these further proceedings by the Park Commissioners were set forth, and the application for an injunction against the commissioners was renewed. The bill and supplemental bill were then in part answered and in part demurred to by the commissioners. The answer, with some unimportant modifications, substantially admitted the allegations of the bill and the supplemental bill; the demurrer

was to the construction of the statute contended for by the complainants and to the relief sought by them. The cause was set down for final hearing on the bill, supplemental bill, answer, and demurrer. And the court, by Mr. Justice Cox, after having granted a temporary injunction *pendente lite*, finally awarded a permanent injunction perpetually enjoining and restraining the Park Commissioners from assessing the land of the complainants for the purposes specified by them or for any purpose whatsoever, and rendered a decree to that effect.

From this decree the commissioners have prosecuted the present appeal to this court.

[The opinion of Mr. Justice Cox, in the court below, to which reference is made in the opinion of this court, is as follows (the introductory paragraphs thereof being omitted):

The authority of the commission to levy benefit assessments is derived from the sixth section of the act of Congress aforesaid, which contains two clauses, the differences between which are to be noted. The first clause is:

" That the commission, having ascertained the cost of the land, including expenses, shall assess such proportion of such cost and expenses upon the lands, lots, and blocks situated in the District of Columbia especially benefited by reason of the location and improvement of said park, as nearly as may be, in proportion to the benefits resulting to such real estate."

The second clause is:

" If said commission shall find that the real estate in said District directly benefited by reason of the location of the park is not benefited to the full extent of the estimated cost and expenses, then they shall assess each tract or parcel of land specially benefited to the extent of such benefits as they shall deem the said real estate specially benefited."

It will be observed that the second clause provides for the contingency that the real estate in the District of Columbia is not benefited to the full extent of the estimated cost and expenses, and it might hence be inferred that the

first clause was intended to provide for the contingency that the benefits did extend to the whole amount of the cost and expenses, and that the first clause intended to direct the whole of that cost to be assessed upon the several tracts, lots, or blocks of land situated in the District of Columbia in proportion to the benefits resulting to them respectively.

But the language of the first clause is absolute and unconditional. "The commission *shall assess*" is the language. The question is, What shall they assess? Can it mean that they shall assess the whole cost, apportioning it among the several tracts with reference to their *relative* benefits and without reference to their *actual* benefits? If so, it would, in the first place, be plainly unconstitutional, because it would make the several tracts pay for benefits they never received; and, in the next place, it would be in conflict with the second clause, which limits the assessments to the extent of the actual special benefit. Can the first clause mean that there shall be assessed upon the several tracts just such proportion *or portion* of the entire cost as the actual pecuniary benefit to them will amount to? If so, what was the use of the second clause, for that is just what that was intended to express. But even here, again, there would be a contradiction between the first and second clauses, for the one directs the assessment to be made with reference to the *location and improvement* of the park, and the other with reference to the *location* only. We must assume that Congress did not intend to direct the same thing to be assessed by two different clauses, and still less to direct it to be done in two different ways.

Bearing this in mind, when we examine the first clause we find that it has an uncompleted direction making it entirely meaningless. It directs, not that the whole cost shall be assessed, but that "*such proportion*" of cost and expenses shall be assessed. What that proportion is, is not stated. Instead of saying "such proportion as may be determined by the commission," or as may be deter-

mined by one or other of certain considerations, the sentence is left incomplete, and directs simply the assessment of " such proportion" without in any other way defining the proportion. If the court were asked to direct the commissioners by *mandamus* to discharge the duty devolved upon them by this clause, what direction could the court give? What proportion could it direct the commissioners to assess upon the property? It seems evident that the clause is too uncertain to be executed, either voluntarily by the commission or under compulsion from the court, and they must be held to derive no authority to act under that clause.

There is a further difference to be noted between the two clauses. The assessment under the first clause was to be made with reference to the benefits resulting from both the *location and improvement.* In the second clause each tract is to be assessed to the extent of the benefits derived only from the *location* of the park. At the present time it is quite plain that no benefits are derived from the location, because the adjacent owners of property have nothing which they had not before. For this reason it appears that the commission have declared their intention of assessing with reference to both location and improvement. Their whole authority is derived under this second clause, and that does not authorize them to assess with reference to both *location and improvement*, and so far their proposed assessment is therefore without authority of law.

But if it could be held to authorize such proposed assessment, the standard by which they are to be guided is so uncertain as to make the execution of the law as impossible under this as under the former clause. When a street is by municipal ordinance directed to be opened, graded, paved, or otherwise improved, we all know exactly what is to be done and what the effect will be upon adjacent property; but there is no law providing for the improvement of the park. No system of improvement has been adopted; no money has been appropriated for the purpose of making

improvements, and no one knows that any ever will be appropriated. The only standard which the commissioners would have for estimating benefits with reference to improvements would be found in their imagination as to what may be done at some indefinite time in the future. It is impossible that a just appraisement of benefits could be made on that basis. Here, also, if the court were to attempt to enforce the duty charged upon the commissioners, it would find it equally impossible with such procceeding under the first clause, as already suggested.

I think, therefore, that the assessment proposed to be made by the commissioners is not authorized by the statute, and as it would create a charge upon the record on the property of the complainants it ought to be enjoined, the question as to the jurisdiction of the court in that respect having been waived in the argument for the purpose of bringing before the court the naked question of the authority of the commissioners.

Again, it seems to me that the assessment of values and the assessment of benefits were intended to be parts of one and the same transaction; that the assessment of benefits was to immediately follow the ascertainment of the cost of the land and the expenses. The language of the second clause is, not that after the land shall have been paid for the assessment shall take place, but that the commissioners, *having ascertained the cost, shall assess*, etc. In the second clause they are to ascertain whether the property, is or is not benefited, and, if so, whether it is benefited to the extent of the *estimated cost and expenses*. This language shows that the assessment of benefits was to take place immediately after the ascertainment of the cost or the estimated cost, and was not to be postponed until after payment for the land.

Another evidence of that is found in a later clause, which directs that the money collected under these assessments shall be paid to any persons entitled thereto as compensation for land or services. Here follow certain incongruities

in the law.   The assessment, it is said, shall be divided
into four equal instalments and may be paid by any party
interested, in full, or in one, two, three, and four years, with
six per cent. interest.   All payments are to be made to the
Treasurer of the United States, who shall keep the account
as a separate fund.   In case the assessments are not paid,
they were to be collected by the collector of the District in
the same manner as delinquent taxes due to the District of
Columbia, and although the assessments and the taxes
might thus be postponed, the proceeds were directed to be
paid for the land or services, whereas it is plain to any one's
common sense that the holders of the land could not be
postponed until such collection in the payment for their
lands, but were entitled to be paid in cash.

But it is also provided that any party so interested might
pay in full, and in such case it is obvious that the money so
received was primarily applicable to the payment for the
land.   The appropriation from the Treasury of the United
States is of $1,200,000, *or so much thereof as may be neces-
sary*, and this appropriation is made " out of any money in
the Treasury not otherwise appropriated."   The act then
appropriates two distinct funds to the payment for these
lands—first, what should be collected from assessments,
and, next, from the general unappropriated money in the
Treasury.   These two features of the law can only be re-
conciled by assuming that the proceeds of the assessments,
so far as they would go, were to be applied first, and only
so much as it might be necessary, in addition thereto, out
of the general funds in the Treasury.

All this strongly implies that the assessments should be
made immediately after the valuation, in order to ascertain
how much should be paid from the Treasury at large, the
assessments being directed to be kept by the Treasurer as
a separate fund to be applied to this object.   It was there-
fore evidently not intended that the money should first be
paid out of the Treasury of the United States and then after-
wards they should make the assessments.  Particularly

cannot that be the case under existing circumstances.   The law requires that the District of Columbia should reimburse the Treasury of the United States one-half of the amount paid out of the Treasury in four equal annual instalments. That reimbursement, so far as the time which has since elapsed has allowed, it is understood, has been made by the District.   If the assessment for benefits can be made now, it is the duty of the party assessed to pay the whole amount into the Treasury of the United States, and the effect will be that as to one-half of the amount the Government will be paid twice—that is, it has already received payment from the District of Columbia, and would receive payment again from the parties assessed.   The commission has no authority to apportion this assessment between the District and the Government.

It may be that Congress by additional legislation might, if there were no constitutional objection, still direct these assessments to be made and apportioned between the United States and the District of Columbia, but under the existing law it could not be made at this late date without involving the parties assessed in this obligation to pay to the United States what they have already received.

The commissioners, I understand, drew orders upon the Treasury in favor of the parties entitled to compensation for their lands, and they were paid by the Treasury on those orders as vouchers.   The law really only authorized the commissioners to draw upon the money collected from assessments.   Perhaps by fair implication they were authorized also to draw so much as the assessment failed to satisfy of the demands of the land owners, but the effect of their drawing upon the Treasury for the whole amount due for the land was a virtual ascertainment by them that there were no benefits to be assessed, because they had no authority otherwise to draw upon the Treasury for the whole compensation due to the owners.

In addition to these considerations, I have considerable doubt whether this law is strictly constitutional.   I do not

mean to say that it is in conflict with any direct prohibition of the Constitution, but that it is probably foreign to the spirit of that instrument. There are instances in which the fundamental principles of our Government are offended by legislation where no express prohibition is found. For example, the Supreme Court has held that a State has no right to take private property for the use of other private persons instead of for public use. The same would doubtless be held to be contrary to the Constitution of the United States, if attempted under congressional legislation.

When a street is opened under a municipal authority it is often done for the express purpose of benefiting the property through which it is opened as well as the public, and the benefits to the property abutting upon it are so manifest that no one denies the right to assess the abutting property owners for those special benefits. They acquire an easement in the new street over and above that which the public has. They have a right to build and sell with reference to it, and it can never be afterwards closed up as against them, while it may be as against the public. The same may be said of a park in the city. The owners fronting upon it immediately acquire the benefit of light, air, prospect, and, in a certain sense, privacy also, in the shape of immunity from the prying eyes of opposite neighbors, of which privileges they cannot be deprived.

But here is a park established in the country, not at the instance or request of adjacent proprietors, not for their benefit, but declared to be a public park, a pleasure ground for the benefit and enjoyment of the people of the United States, and in which the adjacent owners acquire no easement different from that of the public. Where a great improvement is made for the benefit of the public, it does sometimes happen that a fractional part of that public are so far benefited that it is proper to apportion a larger part of the burden to them, as, for example, where a courthouse is located in a country town. While the expense is chargeable to the county at large, it has sometimes been

properly held that an exceptional proportion of it might be
charged upon the town.    So in the case of the *County of
Mobile* v. *Kimball,* 102 U. S. 691, it was held that the cost
of improving the harbor of Mobile, while chargeable to the
whole county, might be specially charged against the city
of Mobile ; and in this same sense the District of Columbia
is charged with one-half of this improvement, though it is
declared to be for the use of the people of the United
States ; but in this case it is only the smaller part of the
entire public benefited who are supposed to be exception-
ally benefited and who are expected to bear the larger pro-
portion of the burden of the entire public.

But when it comes to assessing individuals for public im-
provements, the question seems to be different.    Suppose,
for example, a court-house or a public monument or post-
office should be erected in a town and the private property
of individuals adjacent to it should be specially taxed for
the supposed greater convenience which they enjoy of ac-
cess to the court-house or postoffice, or the privilege of
gazing upon the public monument, it would at once be seen
that great injustice had been done.    It does seem to me
that this would be a system of taxation which would not
conform to the spirit of our Constitution.    It might as well
have been held proper to assess the buildings opposite to
this court-house for the pleasure of gazing upon the Lincoln
monument, if that monument had been erected by public
authority.

There are several cases, the opinions of which embody
my ideas on this subject, to which I will refer without spe-
cially quoting from them.    54 Mo. 457 ; 65 Pa. St. 146 ;
69 Pa. St. 352 ; 102 U. S. 691.

Upon these grounds I think the injunction should be
granted.—REPORTER.]

*Mr. Hugh T. Taggart* and *Mr. John E. Laskey,* Assistant
U. S. Attorneys for the District of Columbia, for the United
States :

The case would seem to present but two questions, the first involving the power of Congress to impose taxes upon land in the District of Columbia, by way of assessment for special benefits accruing to such land by reason of the expenditure of public funds-for works of public utility ; and if such power exists, secondly, whether the act of September 27, 1890, providing for the acquisition of land for the park, and the levy of assessments upon other lands, specially benefited by its establishment, is a valid exercise of the power.

1. *As to the power of Congress to impose such taxes.* For a discussion of the principles underlying this mode of taxation, see Cooley on Taxation, 416 *et seq. ;* Id. 114 *et seq.,* citing *Kirby* v. *Shaw,* 19 Pa. St. 258 ; *Thompson* v. *Leland,* 24 Wend. 56 ; *Merrick* v. *Amherst,* 12 Allen, 504 ; *Mobile County* v. *Kimball,* 102 U. S. 691.

That land acquired for public parks comes within the rule is conclusively settled. *Shoemaker* v. *United States,* 147 U. S. 297.

There is nothing in the peculiar relation which the District of Columbia bears to the general government to impair in any manner the power of Congress, in the exercise of its legislative functions over the District, to act upon the principles above enunciated.

The power has been frequently exercised by Congress and sustained by decisions of the Supreme Court. *Mattingly* v. *District of Columbia,* 97 U. S. 687, in which the validity of an assessment made by the Board of Public Works was under consideration ; see also *Willard* v. *Presbrey,* 14 Wall. 676 ; *Gibbons* v. *District of Columbia,* 116 U. S. 404 ; *Shoemaker* v. *United States, supra.* This last case is of especial importance in this connection.

There does not seem to be any valid reason why Congress might not, if it saw fit, provide for the acquisition of lands for a park in the District, and for the payment of the whole of the cost out of the national treasury ; or, on the other hand, for the payment of the whole cost out of the revenues

of the District, or for the payment of the cost partly from such revenues and partly through an assessment for special benefits ; and if this be so, there can be no legal objection to its providing for such payment from all these sources, and in such proportions as it may deem proper.

2. *As to the act being a valid exercise of the power.*

Whether the act is a valid exercise of the power is a matter of construction only; we submit that it is sufficiently explicit to manifest the intention of Congress, notwithstanding that it contains some "inapt words" and "incongruous matter." The act clearly provides, primarily, for the acquisition of lands for the park, and makes available the sum of $1,200,000 for the purpose of paying "the expenses of inquiry, survey, assessment, costs of lands taken, and all other expenses incidental thereto." The right of eminent domain and taxation are separate powers. *Getty* v. *Brooklyn*, 99 N. Y. 306. It was, therefore, not only proper, but necessary that the owners of the land taken should be paid without unreasonable delay ; and the act nowhere prohibits the payment out of the appropriation, or expressly postpones such payment until funds had been realized from assessments.

It is also clear from section 6 of the act that Congress intended there should be an assessment upon lands specially benefited ; and such construction should be given to that section, if possible, as will support that intention. *Bernier* v. *Bernier*, 147 U. S. 242 ; *Lau Ow Bew* v. *U. S.*, 144 U. S. 59 ; *Lent* v. *Tillson*, 72 Cal. 421 ; S. C. 140 U. S. 329 ; *Chapman* v. *State*, 16 Tex. App. 78.

The court below held the first clause of section 6 to be too uncertain to be executed, and that it was in fact meaningless. Assuming this criticism to be just as applied to the clause standing alone, it is apparent from the second clause that Congress believed the first clause conveyed the idea of a preliminary assessment by the commission upon lands specially benefited, which might be sufficient to cover the entire cost. That the words " such proportion of," in

the first clause, should be construed to mean "proportion-ately," would seem to be clear when the first and second clauses are read together.   Such construction is reasonable and would make the two clauses consistent and intelligible ; the propriety of its application is amply sustained by the authorities above cited.   By the second clause the commission is directed, in case they shall find that the real estate in the District is not specially benefited to the full extent of the cost of the park, to assess the land benefited to the extent of such benefits only.

The postponement of the making of assessments until after the land taken had been paid for, was proper.   Until the constitutional requirement that just compensation should be made had been complied with, the location of the park could not become a finality, and until it had become so no right could arise to assess for benefits.

Section 6 contains a provision directing the commission to apply to the court for a confirmation of the assessment and to give notice of such application ; and the court is invested in terms with the power "to hear and determine all matters connected with said assessment," and "to revise, correct, amend, and confirm said assessment in whole or in part, or order a new assessment in whole or in part." This satisfies the requirement of " due process of law." *Davidson* v. *New Orleans*, 96 U. S. 97 ; Kentucky Railroad Tax Cases, 115 U. S. 331–2 ; *Spencer* v. *Merchant*, 125 U. S. 354–5 ; *Lent* v. *Tillson*, 140 U. S. 327–8.

The residue of section 6 relates mainly to the method of enforcing the tax, and other incidental matters which are wholly within the legislative control.   *Getty* v. *Brooklyn*, 99 N. Y. 366 ; Cooley on Taxation, p. 513.

*Mr. T. A. Lambert* and *Mr. W. J. Lambert* for the appellees :

1. The measure or proportion of the proposed assessment, no less than the standard by which it is to be made.

are hopelessly indeterminate and incapable of intelligent ascertainment.

2. In order to conform to constitutional requirement, the assessment must have been based upon estimates of cost and expenses made concurrently with the acquisition of the land and in payment of the just compensation therefor.

3. The mandate being to assess for the cost and expenses of location and improvement of the park, it becomes incapable of execution in presence of the admitted fact that no improvement whatever has, in fact, been made.

4. In the absence of any just criterion for determining the proportion of cost and expense for which the land specially benefited shall be assessed, and of the definite standard by which such assessment shall be made, no such assessment can be legally imposed by the appellants, either voluntarily or under the compulsion of judicial process.

5. Without resorting to this assessment, the land composing the Rock Creek Park has been, already, fully paid for out of the general appropriation made for that purpose by the act, the one-half of which general appropriation is now being repaid to the United States by general taxation of real estate within the District of Columbia, so that the purpose of such assessment has been anticipated and the occasion for making it no longer exists, and the making thereof, at this time, would result in the possible payment to the United States of $600,000 over and above the amount actually expended by them in the acquisition of a public park to which neither the District of Columbia nor its citizens have any scintilla of title.

6. The sixth section of the act is obnoxious to the grave constitutional objection that it imposes upon a restricted area of abutting real estate and a comparatively few individuals the burden of the cost and expense of acquiring land for a public park, perpetually dedicated to the use and enjoyment of the people of the United States, wherein the citizen sought to be assessed enjoys no exceptional easement, which he has never solicited, and to which he can acquire no title.

7. Local assessments can only be constitutional when imposed to pay for local improvements, clearly conferring special benefits on the properties assessed, and to the extent of those benefits, and they cannot be so imposed when the improvement is either expressed or appears to be for general public benefit.

Mr. Justice MORRIS delivered the opinion of the Court:

1. The question of the jurisdiction of a court of equity to entertain jurisdiction of a suit of this kind, in view of the provisions of section 3224 of the Revised Statutes of the United States, lies at the threshold of this case, and cannot be ignored. It has not, in fact, been ignored in argument by counsel on either side, although both sides fully concur in the desire that the jurisdiction should be sustained. The appellees, having appealed to the jurisdiction as complainants, very naturally are willing to abide by it; and the appellants, who have desired to be guided by the advice of the court in the premises, and who might possibly, in view of their peculiar functions, be entitled to apply to a court of equity for guidance in the performance of their rather difficult duty, are equally solicitous for some authoritative exposition of the doubtful provisions of the law with regard to that duty. But this concurrence of desire cannot give jurisdiction to the court of equity, unless it can be shown otherwise to exist. We think, however, that this is a case proper for the cognizance of a court of equity.

Section 3224 of the Revised Statutes provides that " no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." This section was taken from the tenth section of the act of Congress of March 2, 1867 (14 Stat. 475), which was an amendment of the internal revenue act of July 13, 1866 (14 Stat. 98), itself an amendment of the acts of June 30, 1864 (15 Stat. 223), and March 3, 1865 (13 Stat. 469); and it is found in the revision among the provisions for the collection of the internal revenue of the United States, where special

provision is made for the recovery of taxes wrongfully levied. This would seem to indicate that it was not intended to apply to cases of special assessment, like that now before us, where it is not a question of the revenues of the United States, but to the matter of the ordinary taxes raised and intended for the support of the Government. A special assessment, it is true, is a tax, in the general sense of the term; but it is not such a tax as was contemplated by the statute that has been cited.

The statute seems to be no more than what was already the doctrine of equity, ever since the decision in the case of *Mooers* v. *Smedley*, 6 Johns. Ch. 28, by Chancellor KENT. A court of equity will not interfere with the collection of taxes simply on the ground that the taxes are illegal. To warrant the intervention of equity, as was said by the Supreme Court of the United States, in the case of *Dows* v. *Chicago*, 11 Wall. 109, by Mr. Justice FIELD, "there must exist in addition special circumstances bringing the case under some recognized head of equity jurisdiction, such as that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or, where the property is real estate, throw a cloud upon the title of the complainant." But it is well settled that, where there are such special circumstances, equity will intervene, and the statute cited is no bar to the intervention.

In the case of the *Union Pacific Railway Company* v. *Cheyenne*, 113 U. S. 516, 525, the Supreme Court of the United States, by Mr. Justice BRADLEY, said:

"It cannot be denied that bills in equity to restrain the collection of taxes illegally imposed have frequently been sustained. But it is well settled that there ought to be some equitable ground for relief besides the mere illegality of the tax; for it must be presumed that the law furnishes a remedy for illegal taxation. It often happens, however, that the case is such that the person illegally taxed would suffer irremediable damage, or be subject to vexatious litigation, if he were compelled to resort to his legal remedy

alone.   For example, if the legal remedy consisted only of
an action to recover back the money after it had been col-
lected by distress and sale of the taxpayer's lands, the loss
of his freehold by means of a tax sale would be a mischief
hard to be remedied.  Even the cloud cast upon his title by
a tax under which a sale could be made would be a griev-
ance which would entitle him to go into a court of equity
for relief."

In the case of *Lyon* v. *Alley*, 130 U. S. 177, 187, which
went up from this District, the same high tribunal, speak-
ing by Mr. Justice LAMAR, said :

" It is a well settled doctrine of this court that equity
will not interpose to arrest the proceedings for the collection
of a tax upon the sole ground of its illegality.   It is equally
well settled by the decisions of this court and the State
courts that, after the land has been sold and a conveyance
of some  sort made to the purchaser, courts of equity have
inherent jurisdiction to give relief to the owner against vex-
atious litigation and threatened injury to the market value
of the land, by removing the cloud which such illegal sale,
and the illegal claim arising from it, may cast upon the title.
and in such case of damage, either existing or apprehended,
equity will interpose for relief, even during the progress of
the proceedings before the sale."

To the same effect are the more recent cases of *Gage* v.
*Kaufman*, 133 U. S. 471, and *Rich* v. *Braxton*, 158 U. S.
375, 405.

The removal of a cloud from the title to land is, there-
fore, a well recognized ground of equity jurisdiction, when
such cloud is the result of illegal taxation.   The prevention
of such a cloud is equally recognized.   Prevention and re-
moval are equally within the domain of the remedial pro-
cesses of equity.

Very applicable to the present, as well as to another as-
pect of the question, is what the Supreme Court of the
United States, by Mr. Justice HARLAN, said in the case of
*Rich* v. *Braxton, supra :*

" It must be remembered that ' it is not enough that there is a remedy at law ; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.' *Boyce* v. *Grundy*, 3 Pet. 210, 215 ; *Drexel* v. *Berney*, 122 U. S. 241 ; *Allen* v. *Hanks*, 136 U. S. 300, 311. And the applicability of the rule depends upon the circumstances of each case. *Watson* v. *Sutherland*, 5 Wall. 74, 79. In the case now before us it cannot be said that the invalidity of the deeds which the plaintiffs seek to have cancelled appears on their face. It is not clear that their invalidity can be placed beyond question or doubt without evidence *dehors* those deeds.

" Besides, by the laws of West Virginia, the tax deeds under which the defendants claim are *prima facie* evidence against the owner or owners, legal or equitable, of the real estate at the time it was sold, his or their heirs or assigns, and all other persons who might have redeemed the same within the time prescribed by law, and conclusive evidence against all other persons that the material facts recited in them are true. Code of W. Va. 1868, ch. 31, sec. 29, &c., Mr. Pomeroy, in his Treatise on Equity Jurisprudence, while recognizing it to be the general rule, established by the weight of authority, that equity will not interfere to remove a cloud from title, where the instrument or proceeding constituting the alleged cloud is absolutely void on its face, so that no intrinsic evidence is necessary to show its invalidity,' or ' where the instrument or proceeding is not thus void on its face, but the party claiming, in order to enforce it, must necessarily offer evidence which will inevitably show its invalidity and destroy its efficacy'—which doctrine, he says often operates to produce a denial of justice—correctly says, that equity will interfere, where deeds, certificates, and other instruments given on sales for taxes are made by statute *prima facie* evidence of the regularity of proceedings connected with the assessments and sales. 3 Pomeroy's Eq. Jur., sec.

1399, and note 1, p. 437, and authorities there cited. And this view is sustained by numerous authorities. *Huntington* v. *Central Pacific Railroad*, 2 Sawyer, 503, 514; *Allen* v. *City of Buffalo*, 39 N. Y. 386, 390; *Palmer* v. *Rich*, 12 Mich. 414, 419; *Marquette, H. & O. Railroad Co.* v. *Marquette*, 35 Mich. 504; *Milwaukee Iron Co.* v. *Town of Hubbard*, 29 Wis. 51, 58; *Weller* v. *St. Paul*, 5 Minn. 95; *Pixley* v. *Huggins*, 15 Cal. 127; *Tilton* v. *O. C. M. Railroad Co.*, 3 Sawyer, 22. See also 2 Blackwell on Tax Titles, sec. 1066, and authorities cited. In the present case there are no defects of a controlling character that distinctly appear on the face of the tax deeds under which the defendants claim title. And as those deeds are made by a statute *prima facie* evidence of title in the grantees named in them, and as, therefore, the plaintiffs, if sued in ejectment by the defendants, would be compelled, in order to defeat a recovery against them, to resort to extrinsic evidence in support of their title, the deeds in question constitute a cloud upon that title, to remove which the plaintiffs may rightfully invoke the aid of a court of equity."

In the case now before us, the statute, under which the Park commissioners are acting, expressly makes their assessment a lien upon the land assessed, and precludes inquiry into the regularity or validity of the antecedent proceedings, precisely as in the case of *Rich* v. *Braxton*, and their action, therefore, necessarily operates to cast a cloud upon the property of the complainants, in respect of which they can have adequate relief only in equity. It is upon the ground that, by the assessment made and threatened to be enforced by the commissioners, a cloud would be cast upon their title to their real estate, and they would be subjected to vexatious litigation and irreparable injury, they expressly seek in their amended and supplemental bill the interposition of a court of equity to relieve them from what is alleged to be the imposition of illegal taxation. And we think, upon the authorities cited, and upon the general principles of equity, that they are entitled to it.

It may be that they should have waited until the commissioners had definitely fixed the amount of the assessment upon their property, and had thereby completed the assessment.   But this probably is a matter which the commissioners could have waived, as they have actually waived it in their brief and in open court; and it is not apparent, under the peculiar circumstances of this case, that any good purpose would have been subserved by further delay.   The commissioners had definitely announced their determination to assess the property in question; in order to fix the amount of the assessment, they required testimony to be taken, which might have involved much delay and expense; and the testimony, when taken, would not have enlightened in any manner the question now at issue, which merely concerns the validity of the statute under which they are proceeding.   The determination of the specific amount of the assessment would not have altered the record, or changed in any manner the rights of parties, so far as they are to be determined by this suit. The question now before us is not the amount of the assessment, but the right of the commissioners to make any assessment.

It may be that this question of jurisdiction should be considered in another aspect also.   The power conferred by the statute upon the Supreme Court of the District of Columbia "to hear and determine all matters connected with said assessment," might perhaps be regarded as a special jurisdiction to be exercised only under the conditions and in the mode prescribed by the statute, and without appeal to this court, since no appeal is expressly provided by the statute itself.   But courts of general jurisdiction, and especially courts of equity, are not ousted of their jurisdiction, or of any part of it, except by positive legislation absolutely inconsistent with its continued exercise.   Sedgwick on Statutory and Constitutional Law, ch. 4 and 8, and cases cited; *Rhode Island* v. *Massachusetts*, 12 Pet. 657. The prevention and removal of clouds upon title are sub-

jects of the general equity jurisdiction ; and the statute establishing the Rock Creek Park does not purport in the remotest degree to interfere with that or any other branch of equity.    When the Supreme Court of the District of Columbia, whether as a court or as an appellate board of assessment, was given the authority referred to here "to hear and determine all matters connected with said assessment," it certainly was not contemplated that one of those matters would be the power of Congress to pass that act itself. And while a court of limited jurisdiction, a board of commissioners, an executive officer, or a private citizen, might decline to exercise powers conferred by a statute which is believed to be void, and would necessarily have to pass upon the question of the validity of the authority sought to be conferred in order to reach the conclusion, yet undoubtedly the attempt to confer such authority cannot in general deprive the courts of general jurisdiction of their right in cases within their cognizance to inquire into the validity of the attempt.    The right of the citizens to have recourse to the courts of this country ought not to be construed to be taken away by indirection, where the protection of those courts is the most needed.

We have virtually so held in the cases of the *District of Columbia* v. *Prospect Hill Cemetery and others* (5 App. D. C. 497), where one of the consolidated suits was a bill in equity to restrain the enforcement of an unconstitutional or invalid statute, and where we affirmed the decision of the court below awarding an injunction in the case.    In the same case, we sustained without question the appellate jurisdiction of this court, which would have been ousted as well as the jurisdiction of equity, if the special jurisdiction there conferred on the Supreme Court of the District of Columbia were of the character to exclude the exercise of the general jurisdiction ; for that also, like the present, was a case of special statutory authority.    The case of *Shoemaker* v. *United States,* 147 U. S. 282, necessarily affirms the same doctrine ; for that was a case growing out of this

very same statute ; and the Supreme Court of the United States there exercised without question the right of appeal from a judgment of the Supreme Court of the District of Columbia rendered in proceedings instituted under the same special jurisdiction.   We do not mean to hold that a special jurisdiction is not to be exercised specially in accordance with the statute ; but that the special jurisdiction here conferred on the Supreme Court of the District of Columbia does not preclude recourse to equity in proper cases of equity cognizance and does not take away the appellate jurisdiction of this court.   *Ex parte Zellner,* 9 Wall. 244.

If we had any doubt about the jurisdiction of equity in this case, with the consequent right of appeal to this court, we would be disposed to resolve the doubt in favor of the jurisdiction, in view of the fact that, under the decisions in the cases of *Shoemaker* v. *United States* and the *District of Columbia* v. *Prospect Hill Cemetery*, the same precise question that is now raised could be raised by almost identical pleadings under an application of the Park commissioners for a confirmation of their assessment.   And we think that it is of no great consequence in which way the question is presented, and that the case is one in which we should look rather to the substance than the form.

We are of opinion that this case is one proper for the cognizance of a court of equity.

2. With reference to the merits of the case, counsel for the appellants in their brief raise two questions, broad enough in their scope, and of very great importance : 1. Whether Congress has power to impose taxes upon land in the District of Columbia by way of assessment for special benefits accruing to such land by reason of the expenditure of public funds for works of public utility ; and, 2. Whether, if such power exists, the act of September 27, 1890, providing for the acquisition of land for the Rock Creek Park and the levy of assessments upon other lands, specially benefited by its establishment, is a valid exercise of the power. And the argument on behalf of the appellants is directed to

show that both questions should be answered in the affirmative.

The extent of the jurisdiction of the Congress of the United States over the District of Columbia must be regarded as quite well settled.    The District of Columbia was established for the purposes of the Federal Union, and not for any purposes of its own ; and Congress acts therein as the legislature of the Union, but with exclusive jurisdiction extending to all legitimate subjects of legislation. *Cohens* v. *Virginia*, 6 Wheat. 264 ; *Loughborough* v. *Blake*, 5 Wheat. 317 ; *Willard* v. *Presbury*, 14 Wall. 676 ; *Mattingly* v. *District of Columbia*, 97 U. S. 690.    But that this exclusive jurisdiction is limited and restricted by the Federal Constitution and the amendments thereof, and by the fundamental principles of right and justice recognized by that Constitution, is equally beyond question.    Story on the Constitution, sec. 1234 ; *Callan* v. *Wilson*, 127 U. S. 640.    There is no place anywhere in our system of government, State or Federal, for the theory of legislative omnipotence claimed to appertain to the English Parliament.    But except in so far as it is thus restricted by the fundamental law, the legislative authority of Congress over the District of Columbia is supreme and unlimited.

Among the ordinary and essential attributes of sovereignty and subjects of legislation is the power of taxation, which, as Mr. Cooley says in his Treatise on Constitutional Law, ch. 4, p. 55, is " unlimited in its range as to the kind of taxes that shall be laid, or the subjects upon which it shall be imposed."    And yet this great and vast power of taxation is rigidly limited in the one respect that it must be uniform and equal in its operation, must be levied for public not for private purposes, and must be laid according to some definite and positive rule of apportionment.    Taxes may be laid upon lands, upon personal property, upon occupations, upon special classes of property, or upon special occupations, or upon persons ; but within the scope of the selection the tax must be uniform.    One man cannot be

taxed more in proportion than another. These are well established principles of the law of taxation that require no citation of authorities to support them.

It may be that this principle of uniformity is not secured for the District of Columbia, with regard to the power of exclusive legislation over it that is vested in Congress by the requirement of the Eighth Section of the First Article of the Constitution, that "all duties, imposts, and excises shall be uniform throughout the United States;" for that may well be construed to refer to taxes levied by Congress over the whole territory of the Union. But it is abundantly secured by the provision in the Fifth Amendment to the Constitution that "no person shall be deprived of life, liberty or property without due process of law: nor shall private property be taken for public use without just compensation." For private property would be taken for public use without any compensation, and due process of law would absolutely be wanting in any system of taxation that was not uniform in its operations—not necessarily uniform in its results or operating to do exact justice, but free from undue discrimination as to persons.

Whether taxation by way of special assessment is free from the objection of want of uniformity is open to grave doubt. The practice of levying special assessments seems to be now very generally established throughout our country by legislative and municipal action, and to have received the sanction of courts and of text-writers, yet evidently not without some misgivings as to the correctness in principle of the theory upon which the practice is based. See Cooley on Taxation, pp. 416, 417. With all due respect to the public sentiment in favor of the theory of special assessments and to the great preponderance of judicial decision by which it has been sustained, we are disposed to think that a system, to which a large part of the municipal corruption that exists in our country can be traced, and which leads to a result so absurd as that evidenced in the act of Congress now under consideration, must be radically

vicious and unjust. We think that it is vicious, because it is arbitrary; all things arbitrary in the administration of government are vicious. We think that it is unjust, because it compels the individual citizen in many cases, probably in most cases, to pay more than his just share of the common burden for the public good.

Special assessments are levied arbitrarily and without any rule having a fixed foundation in justice. They are usually authorized in connection with some unusual scheme of public improvement like this Rock Creek Park enterprise in the present instance. Generally they do not form part of any permanent or well-established scheme of taxation; and they vary in their scope and terms with every varying enterprise to the aid of which they are applied. Sometimes one-fourth, sometimes one-third, sometimes one-half, and sometimes even two-thirds or three-fourths of the cost of a public improvement is levied under the theory of special assessment upon adjoining owners supposed to be benefited specially by such public improvement. And if any part of the cost may so be assessed, the whole may be. Indeed, in the very case before us, it is sought to cast the whole and entire cost of the enterprise upon the adjoining owners; and the theory is carried to its extreme extent, a conclusion that would make it ludicrous if it were not so grossly oppressive.

But if these works, for which special assessments are sought to be levied, are public works, the public alone should pay for them. If they are not public works, the public authorities have no right to undertake them. We believe that there is no middle ground of partnership in such work between the public and the individual citizen; and that compulsory payment therefor by the individual citizen is unjust, when perhaps he has not requested the improvement and may even have antagonized it. The system grew out of early legislation, in which, when the opening of streets or other public enterprises was somewhat in advance of the requirements or of the resources of a municipality or community, and private individuals, specially inter-

ested, and to whom the enterprise would be an immediate benefit, requested the work, compliance with their request was authorized upon their assumption of a share of the expense. But in those cases the special assessment was the result of a contract, and was therefore never compulsory.

We are aware that there is very great plausibility in the theory of special assessment. At first sight it seems to be exceedingly just and equitable that one whose property has· been enhanced in value by its proximity to a public improvement, should· contribute to the cost of that improvement in proportion to the amount of benefit received by his property. But the proposition is more plausible than sound. Apart from the incongruity of benefiting one without his consent and possibly against his will and then levying a contribution upon him for that in which he has had no voice, and assuming that the so-called benefits are not illusory and intangible, the fair and just contribution of the citizen is secured without arbitrary exaction by the increased assessment of his property for general taxation and the increased returns therefrom to the general fund. Moreover, it is not quite apparent, upon general principles of justice, why, when a public improvement is located in a certain neighborhood, without inducement by adjoining owners for its location there, peremptory demand should then be made upon those owners to hand over to the public a sum of money equivalent to the supposed enhancement of their property in value by reason of the location of the public improvement. A private individual, who improves a neighborhood by building therein, could not with much grace support a demand upon his neighbors for contribution to the cost of his building, on the ground that their property has been enhanced in value by his action ; and there does not seem to be any better reason for the public to do so. Nor, when contrary conditions arise, is there any rule of law or equity that requires the public to compensate an adjoining owner, when his property has been depreciated in value by the location in his neighborhood of a jail, or a pest-house, or any

other similar undesirable structure. The sovereign, or a municipality as the representative of the sovereign, should not shield itself in the one case behind the theory that the State can do no wrong, and yet claim in the other case that there is natural equity in its favor.

But while we have deemed it not improper thus strongly to express our views upon the substantial merits of the theory of special assessment, it must be admitted, as we have already stated, that the great preponderance of judicial authority is in favor of sustaining the validity of legislative action which imposes such assessments. In our own jurisdiction the Supreme Court of the United States, in the case of *Mattingly* v. *District of Columbia*, 97 U. S. 687, has sustained the theory, upon the ground merely of the great current of judicial decision to that effect; and to that authority, of course, we must bow. It is not necessary for us in the present case to base our decision upon the hardship of special assessments, or upon the supposed unsoundness of the theory upon which they are sustained. The theory has its limitations and restrictions, as has the power of general taxation ; and we think that it will be found, upon a closer analysis of the authorities, at all events of the best authorities upon the subject, that the theory has been applied only when some easement or appurtenance has been added to the lands of the person assessed, or when some advantage has been given to him which he did not possess before, such generally as the improvement of a street for access to his property, or the construction of a sewer for the drainage of his land, or some similar work which he could and should have done for himself, if it were not that such work by a private individual for obvious reasons would be impracticable.

The Rock Creek Park, authorized by the statute now before us, is nothing of that kind. It is something, as expressly declared in the act, " perpetually dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States." It is a public enterprise, therefore, for a purely public purpose, and

for the general benefit of all the people of the Union ; and assuming that, inasmuch as it is located in the District of Columbia, and is of special benefit to the District of Columbia, Congress can properly impose a special assessment on the District of Columbia to defray a part of its expense, it does not follow that it can go farther and impose the whole cost or any part of it upon any individual or number of individuals in the neighborhood whom it pleases to select for the purpose of assessment. Recognized territorial subdivisions, such as counties, townships, municipalities, may undoubtedly be specially assessed under the authority of the State for a share of the cost of works of public improvement located within their borders ; for the reason that such territorial organizations are only creatures of the State for governmental purposes and are wholly within the control of the State; and what we have heretofore said in reference to special assessments in general has no application to them. This much we understand to have been decided in the case of *Mobile* v. *Kimball*, 102 U. S. 691 ; and this also is the extent to which we understand the intimation to go of the Supreme Court of the United States in the case already cited of *Shoemaker* v. *United States*, 147 U. S. 282. Nor do we understand that any different principle is laid down by any of the decisions cited in the latter case. But individual citizens cannot thus be selected for assessment, nor can their property be constituted a special taxing district for the occasion. Mr. Justice Cox, in his excellent opinion in this case, well said :

." When it comes to assessing individuals for public improvements, the question seems to be different. Suppose, for example, a court-house or a public monument or post-office should be erected in a town and the private property of individuals adjacent to it should be specially taxed for the supposed greater convenience which they enjoy of access to the court-house or postoffice, or the privilege of gazing upon the public monument, it would at once be seen that great injustice had been done. It does seem to me

that this would be a system of taxation which would not conform to the spirit of our Constitution. It might as well have been held proper to assess the buildings opposite this court-house for the pleasure of gazing upon the Lincoln monument, if that monument had been erected by public authority."

In this we fully concur. We think that it fairly and justly expresses the law on the subject. The sixth section of the act of Congress of February 27, 1890, establishing the Rock Creek Park, so far as it can possibly be constructed to have a meaning, has for its sole object and purpose the imposition of a special assessment on the lands adjoining the park for the purpose of paying the cost and expense of the park. In fact, it seems to have been contemplated that such special assessment might pay the whole cost and expense of the park, including even the compensation payable to the commissioners, and leave a surplus to be expended in the improvement of the grounds. More than that—the section is capable of a construction that would make the enterprise a speculation of most extraordinary and remarkable profit to the United States ; for besides the fact that under it an assessment would be possible that would secure sufficient money to replace in the Treasury of the United States the whole amount of $1,200,000 that was expended in the acquisition of the land for the park, there is the provision that the District of Columbia as a municipality must in any event refund one-half the amount, or $600,000, to the Treasury. So that it would be quite feasible under the act for the United States to receive $1,800,000 by a levy of forced contribution to reimburse them for their expenditure of $1,200,000. Such a result would be shocking to our sense of natural justice, to all our ideas of constitutional guaranty, and to our whole theory of governmental propriety. An enactment that necessarily leads to this conclusion we are compelled to regard as a violation of the Constitution of the United States.

3. But proceeding one step farther, we find that not only

is this section violative of the fundamental law of the land, but it is likewise so hopelessly inconsistent and meaningless that it is impossible to determine its sense with any certainty ; and consequently impossible to execute it with any propriety, even if it were not affected with the fatal taint of unconstitutionality.   It is very evident that this section was passed without much, if any, consideration by Congress. It does not reflect the legislative mind or express the legislative intention, and it is so hopelessly involved in palpable inconsistency and a maze of meaningless verbiage that it is impossible to apply to it any of the canons of construction that a court is authorized to apply in such cases.   Counsel for the appellants virtually ask us so to reconstruct the phraseology of the enactment as to give it sense and meaning.   Courts have gone very far, where the legislative intention is clear, to disregard words and terms that were evidently not contemplated to be in the statute, in some cases even converting negative phrases into positive phrases, and the reverse (*Chapman v. State*, 16 Tex. App. 78); but in all such cases the meaning intended by the legislature must be clear from the context.   Not only is the meaning in the present case not clear: it is difficult, if not impossible to deduce any meaning from the language employed.   We can add nothing to the excellent analysis of the section made by Mr. Justice Cox, in his opinion, which appears in the record in the case ; and we can do no better than concur in that opinion and embody it in our own.*

One feature of that opinion we may emphasize.   One clause of section 6 seems to authorize assessment by the commissioners for benefits accruing from the *location* and *improvement* of the park ; another clause for benefits accruing from the *location* alone.   It is conceded that there has been absolutely no *improvement* whatever of the park thus far, and that the only change is in the transfer of title to the United States.   The only power to assess is, therefore, in the clause which authorizes assessment for location, if it

---

*For opinion of Mr. Justice Cox, see page 194.—REPORTER.

does, in fact, so authorize; and here again it is conceded that there has been no change whatever from previous conditions. Adjacent owners, then, are to be assessed because the United States have taken title to a tract of land adjoining them, in order to lessen the burden of expense to the United States. To state the proposition is to demonstrate its gross absurdity.

We think that the decree of the Supreme Court of the District of Columbia in the premises was right; and that decree must be *affirmed with costs.*

Mr. Chief Justice ALVEY, dissenting:

I regret very much that there should be any dissent from the opinion of the majority of the court in this case. But I feel compelled to dissent from the opinion and conclusion of my brothers in respect to the two main propositions maintained by them in their opinion. First, that there is jurisdiction in a court of equity to grant the relief prayed for in the original and supplemental bill, upon which the decree below was founded; and, second, that the express power given by the sixth section of the act of Congress of September 27, 1890, authorizing the assessment of real estate for special benefits accruing thereto, by reason of the establishment of a public park in the District of Columbia, is in violation of the Constitution of the United States, and therefore utterly void.

I shall state the reasons of my dissent on these two propositions briefly, and shall, therefore, not attempt to recite the allegations of the bill. Suffice it to say, that the application for and the granting of the injunction were both before any assessment had been actually made upon the property of the complainants; and that, while there are many grounds alleged in the bill for the injunction, the principal ground for the relief prayed is, that of the supposed unconstitutionality of the sixth section of the act of Congress authorizing the establishment of the park.

The defendants, United States officers and agents, constituted by the act a commission to lay off and acquire the land for the park, either by purchase or condemnation, with authority to make the special assessments upon the lands specially benefited by the improvement, answered certain parts of the original and supplemental bill of the complainants, and demurred to certain other parts; and for cause of demurrer, alleged that the complainants have not in and by their original and supplemental bill, made or stated such a case as entitles them to any relief in a court of equity.

On this state of the record the majority of this court hold, as I understand the opinion, affirming the decree of the court below, that a court of equity has jurisdiction to take cognizance of the case, and that the sixth section of the act of Congress involved is entirely unconstitutional and therefore void, and that, consequently, the complainants are entitled to a perpetual injunction against the exercise of any of the powers thereby attempted to be conferred by Congress.

1. With respect to the first question presented, that of the jurisdiction of a court of equity to take cognizance of the case, I entirely dissent from the opinion of the majority of the court. Congress having by the act in question provided the mode of procedure, and conferred, by express terms, jurisdiction upon the Supreme Court of the District, " to hear and determine *all matters connected with said assessment;* and to revise, correct, amend, and confirm said assessment, in whole or in part, or order a new assessment in whole or in part, with or without further notice, or on such notice as it shall prescribe;" and declared that " the orders of the court shall be conclusive evidence of the regularity of all previous proceedings necessary to the validity thereof, *and of all matters recited in said orders,*" in my opinion, a court of equity has no power to review and control the action of the Supreme Court of the District, in the exercise of its powers and jurisdiction under the statute. That jurisdiction is exclusive, subject only to the right of appeal to an appellate jurisdiction upon questions of con-

stitutional rights actually involved in the proceeding. To give to a court of equity jurisdiction, in the absence of express statute, there must be presented a case where the principles of law, by which the ordinary courts are guided, give right, but the powers of those courts are not sufficient to afford a complete remedy, or their modes of proceeding are inadequate to attain full and complete justice ; or where the courts of ordinary jurisdiction are made instruments of injustice ; or where the principles of law by which the ordinary courts are governed give no rights, but upon the principles of universal justice, the interference of a court of equity is necessary to prevent a wrong, the positive law being silent. In neither of these categories is the present case embraced. There is ample remedy provided by the statute ; and where the legislature has given jurisdiction by statute to a designated court, for taking and conducting proceedings under the statute, and especially where it has made the decision of that court final, no equity can be founded on the allegation that such court is not properly competent to decide questions that may arise within its jurisdiction. In such case, a court of equity does not become a court of review, nor can it be made subsidiary to the tribunal created or clothed with power by the legislature for settling the rights of parties, upon the mere ground that that tribunal has miscarried, or may miscarry, in the settlement of those rights. *Canal Co.* v. *Tribell*, 7 Beav. 19, 28 ; *Bateman* v. *Boynton*, L. R. 1 Ch. App. 360, 368. The Supreme Court of the District was given power and jurisdiction, by the terms of the statute, after due notice given, "*to hear and determine all matters* connected with said assessment ;" and the mode of proceeding prescribed by the statute, is due process of law. The Supreme Court of the District was and is competent to decide every question connected with the assessment, that could arise or be presented in the course of the proceeding, including the question of the constitutionality of the act itself. In the event of holding the act, or any part of it, unconstitutional, or the re-

fusal so to hold it, upon presentation of such question to the court by exception to the report of the commissioners, an appeal would lie to this court, as a writ of error did lie to the Supreme Court of the United States before this court was established. *Shoemaker* v. *United States*, 147 U. S. 282. And even an appellate court, much less a court of equity on a collateral application, will not interfere with the report of commissioners, to correct errors of procedure, or errors of judgment in arriving at the amount of assessment. Mills on Eminent Domain, 246; *Shoemaker* v. *United States, supra.* This is well illustrated by the much cited case of *Mooers* v. *Smedley,* 6 John. Ch. 28. In that case the supervisors of a town, under an act of the legislature, and pursuant to the vote of the town, allowed bounties for the destruction of wolves, the amount of which was inserted in the annual tax list, to be levied and collected of the owners of land. On an application for an injunction, to restrain the collection of the sums so allowed for bounties, the injunction was denied. And in denying the injunction, Chancellor KENT remarked: "I cannot find, by any statute, or precedent, or practice, that it belongs to the jurisdiction of chancery, as a court of equity, to review or control the determination of the supervisors, in their examination and allowance of accounts as chargeable against their county, or any of its towns, and in causing the money so allowed to be raised and levied. There was no allegation of fraud or corruption in the case. The most that could be said, was, that they made an erroneous determination." That case has been cited and approved by the Supreme Court of the United States in the case of *Hannewinkle* v. *Georgetown,* 15 Wall. 547. In the present case, as in the case of *Mooers* v. *Smedley,* there is no allegation or pretence that there is any fraud or corruption in the case. Here, there was a competent court provided to direct and supervise the proceedings of the commissioners.

The effort to introduce an element that would give jurisdiction to the court, by alleging that the threat of assess-

ment for special benefits would produce a cloud upon the title of the property of the complainants, because, if consummated, such assessment would create a lien upon the property, will not justify a court of equity in interposing, and thereby become a court of review upon the proceedings authorized by the statute.    Such allegation is easily made, and it could as well be made in every case of proceeding at law, where the judgment would create a lien upon the property of the debtor, as in the present case. There must be something more than the mere fact that the property may be subject to a lien, as the final result of the pending proceeding, in order to confer jurisdiction upon a court of equity to arrest such proceeding by injunction.   In this case, according to the theory and assumption of the bill, the attempted assessment for special benefits is unconstitutional and void, because the act of Congress was passed without constitutional warrant, and is therefore void upon its face.    If this be true, according to well-established principle, there is no such cloud upon the title as will justify the interference of a court of equity ; the statute showing upon its face that it is without force or authority to charge the estate.    *Dows* v. *The City of Chicago,* 11 Wall. 109 ; *Hannewinkle* v. *Georgetown,* 15 Wall. 547.

Courts of equity are not constituted for the purpose of arresting proceedings, and assuming to themselves the right of disposing of cases, that are properly depending in the ordinary courts of law.    It is only upon special and particular circumstances, appealing to the conscience of the chancellor, that a court of equity is justified in interposing for the relief of the party complaining.    A court of equity is not constituted a court of review on constitutional questions that may be decided by tribunals inferior to the Supreme Court of the United States ; nor is such court possessed of exclusive, nor even of concurrent, jurisdiction in respect to such questions ; and hence there is no authority or reasonable ground for coming to a court of equity in a case like the present.    In every case, circumstances should be stated

that show that in the particular case there is an equity that cannot be availed of by the party complaining, in the proceedings sought to be restrained. There can be no reason or propriety in appealing to a court of equity to restrain proceedings that are being regularly conducted in other courts, competent to construe the statutes under which they act, and to decide every question that may arise in the course of the proceeding. To allow litigations to be thus diverted, tends to the multiplication of litigation, and the production of unnecessary delay and expense, to say nothing of the unnecessary vexation to parties. I am of opinion, therefore, that there is no jurisdiction in equity to maintain the bill in this case.

2. But, assuming the existence of jurisdiction, and that the question was properly before this court for decision, in such case, I should have no difficulty whatever in holding that the sixth section of the act of Congress of September 27, 1890, 26 Stat. 492, ch. 1007, is constitutional and valid. Looking to the large and unrestricted legislative power of Congress over this District, under the Constitution, if the power to authorize assessments for special benefits, by reason of improvements, exists anywhere, it would seem certainly to exist here. The sixth section, declared unconstitutional by the opinion of the majority of the court, forms a vital part of the act, and in fact constitutes the basis of the plan and scheme of the park. Without the provision contained in the sixth section of the act, to supply the means of indemnity and reimbursement, it can hardly be supposed that Congress would have passed the act, and charged the entire cost and expense of the improvement to the Treasury of the United States, and to the District of Columbia. It was in view of what was deemed a well-settled principle, that of legislative power to authorize assessments for special benefits, that Congress provided by the sixth section of the act, that the commissioners should assess, by way of indemnity and reimbursement, "such proportion of the cost and expenses upon the lands in the

District of Columbia specially benefited by reason of the location and improvement of said park, as nearly as may be, in proportion to the benefits resulting to such real estate." The constitutional power to impose such assessments for special benefits, was supposed to be too well established to be made a matter of serious question. It had been so expressly decided by the Supreme Court of the United States, in cases arising in this District. *Hannewinkle* v. *Georgetown*, 15 Wall. 547 ; *Mattingly* v. *District of Columbia*, 97 U. S. 687. And in a case arising under the very statute now under consideration, the question of the constitutionality of the sixth section of the act was pointedly made and expressly decided in affirmance of the validity of the section, and of the entire act. Indeed, to strike from the statute the sixth section, as being unconstitutional or otherwise void, is simply to disembowel the act, and destroy the means designed for the ultimate payment of the cost and expenses of the improvement, and impose the whole burthen upon the United States Treasury and the District of Columbia. This is a very grave consequence of declaring the sixth section of the act unconstitutional, or otherwise inoperative, and it should only be so declared upon the plainest and most unmistakable ground. In my judgment, with all due deference to the opinion of my brothers, the sixth section of the act is not only constitutional upon general principles of legislative power, but it has been so expressly declared by the Supreme Court of the United States, in the case just referred to, of *Shoemaker* v. *United States*, 147 U. S. 302.

In that case, the court, in considering the several questions that involved the constitutionality of the entire act, said : "A further objection is made to the validity of the act, by reason of the sixth section, which provides for the assessment of benefits resulting from ' the location and improvement of said park,' upon lands so especially benefited.

" The cases heretofore cited to show that the erection of parks in cities is a public use, in a constitutional sense,

were, most of them, cases in which it was likewise held that it is competent for the legislature, in providing for the cost of such parks, to assess a proportionate part of the cost upon property specially benefited ; and we need not repeat the citations.

" No special request, on the subject of the legal effect of the provision in respect to special benefits, seems to have been made to the court below, and there is no specific assignment of error as to it.    Nor does it appear that any person having property actually assessed for special benefits is a party as plaintiff in error.    We are therefore relieved from any extended consideration of this feature of the act."

And, in the conclusion of the opinion, the court say, " Our conclusion is that we find, in the legislation creating the park and in the proceedings under it, no infringment of the Constitution or of the legal rights of the plaintiffs in error, and the judgment of the court below is accordingly affirmed."

This broad declaration as to the validity of the act would hardly have been made by the court, if one of the principal parts of the statute, and which had been urged as being unconstitutional, and therefore affecting the validity of the entire act, had appeared to the court as being subject to the objection taken to it.    I see nothing in the sixth section of the act which requires from the court the declaration that the section is unconstitutional, or otherwise void, or inoperative, either in whole or in part.    And being of this opinion, I must dissent from the opinion of the majority of the court ; and, according to my opinion, the bill filed in this case should have been dismissed.